Exhibit A

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 2 of 91    RECEIVED NYSCEF: 12/06/2021

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------------x

Anthony Marciano, individually, and on behalf of all other
individuals similarly situated,

                          Plaintiff\Petitioners

                -against-

BILL DE BLASIO, MAYOR OF THE CITY OF NEW YORK,
in his official capacity; DAVE A. CHOCKSHI,
COMMISSIONER OF HEALTH AND MENTAL HYGIENE,
in his official capacity; DERMOT SHEA, POLICE
COMMISSIONER, in his official capacity; THE NEW YORK
CITY BOARD OF HEALTH; and THE CITY OF NEW YORK.

                       Defendants\Respondents

INDEX NO. _____

**VERIFIED ARTICLE 78
PETITION AND
COMPLAINT**

---------------------------------------------------------------------------x

       Plaintiff/Petitioner Anthony Marciano, and all other individuals similarly situated,

("Petitioner"), through their attorneys, Patricia Finn Attorney, P.C., as and for their Verified

Article 78 Petition/Complaint ("Petition") against BILL DE BLASIO, MAYOR OF THE CITY

OF NEW YORK, in his official capacity ("Mayor"); DAVE A. CHOCKSHI, COMMISSIONER

OF HEALTH AND MENTAL HYGIENE, in his official capacity ("Health Commissioner");

DERMOT SHEA, POLICE COMMISSIONER, in his official capacity ("Police

Commissioner"); THE NEW YORK CITY BOARD OF HEALTH (the "Board"); and THE

CITY OF NEW YORK (the "City" or "NYC") (collectively "Respondents"), as set forth herein,

respectfully state and allege, upon information and belief, as follows:

## PRELIMINARY STATEMENT

      1.    Petitioner is challenging the "ORDER OF THE COMMISSIONER OF HEALTH

AND MENTAL HYGIENE TO REQUIRE COVID-19 VACCINATION FOR CITY

EMPLOYEES AND CERTAIN CITY CONTRACTORS" (the "Vaccination Order", or the

"Order") signed by Respondent Health Commissioner, dated October 20, 2021, and annexed hereto as **EXHIBIT 1**.

2.      Petitioner is challenging the "SUPPLEMENTAL ORDER OF THE COMMISSIONER OF HEALTH AND MENTAL HYGIENE TO REQUIRE COVID-19 VACCINATION FOR CITY EMPLOYEES AND CERTAIN CITY CONTRACTORS (the "Supplemental Order") signed by Respondent Health Commissioner, dated October 31, 2021, and annexed hereto as **EXHIBIT 2**.

3.      The Vaccination Order requires that "Any City employee who has not provided the proof described in Paragraph 2 must be excluded from the premises at which they work beginning on November 1, 2021." (Vaccination Order, ¶ 3, **EXHIBIT 1**.)

4.      The legal question raised by Petitioner is very simple: Does the Health Commissioner have the legal authority to issue the Vaccination Order? The answer is No.

5.      The Respondents lack legal authority to issue a Vaccination Order because said Order violates Petitioner's Constitutional and civil rights to refuse informed consent, as well as certain New York State and New York City ("City" or "NYC") statutes, codes, rules, and ordinances, as detailed hereinafter.

6.      In addition, the Orders issued by the Respondent Police Commissioner to implement the Vaccination Orders violate Petitioner's right to due process in that the only available vaccinations for distribution in this state are unapproved vaccinations for licensing, authorized by Food and Drug Administration as Emergency Use Authorized (EUA) drugs as a Covid 19 countermeasure.

7.      In the absence of legislative authority, or written, informed consent, or a Judicial Order of quarantine to impose an involuntary, investigational, unapproved drug the Vaccination

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 4 of 91

3

Orders cannot be imposed on NYPD personnel.  PHL §2120, Judicial Order of quarantine; PH

24 – A, Protection of Human Subjects.

8.      Because the only available vaccinations in the United States are authorized under

the EUAs, they are considered unapproved, investigational, and experimental products requiring

informed consent.  See PH 24-A, *informed consent.*  In 2003, the Defense Department attempted

to impose an experimental Anthrax vaccine on soldiers.  The Court of Appeals for the District of

Columbia struck down the mandate holding "The Court is persuaded that the right to bodily

integrity and the importance of complying with legal requirements, even in the face of

requirements that may potentially be inconvenient or burdensome, are among the highest public

policy concerns one could articulate. … Absent an informed consent or presidential waiver, the

United States cannot demand that members of the armed forces also serve as guinea pigs for

experimental drugs." *John Doe #1 v. Rumsfeld,* 341 F.Supp.2d 1 (2003 WL 22994225) (D.D.C.

Dec. 22, 2003).

9.      A central question before this Court is whether investigational, unapproved drug

requires informed written consent to impose its use under PH 24-A, and PHL §2120, without

informed consent.  This inquiry turns on the FDA status of the unapproved status of the

vaccination.

10.     As an unapproved, investigational drug PHL §2120, and PHL Article 24-A,

informed consent requirements apply.  "No human research may be conducted in this state in the

absence of the voluntary informed consent subscribed to in writing by the human subject. PHL §

2442.

3

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 5 of 91

4

11.     This Petition/Complaint ("Petition") does not question the authority of the State of New York to mandate vaccination on adults without informed consent under the state's *police powers*.

12.     The determination as to whether or not a mandatory COVID-19 ("COVID") vaccination is a desirable public policy is not before this Court.  The authority to make that determination to impose an adult vaccine mandate is vested in the New York State Senate and Assembly (the "Legislature").

13.     The decision to mandate the vaccination of certain healthy adults, and not others, requires an evaluation of political, economic, and social concerns, which is a nondelegable legislative function.  *Boreali v. Axelrod*, 71 N.Y.2d 1, 12, 523 N.Y.S.2d 464, 470, 517 N.E.2d 1350, 1355 (1987).  It is an "oft-recited principle" in New York "that the legislative branch of government cannot cede its fundamental policy-making responsibility to an administrative agency." Id at 9.

14.     Petitioner is seeking a Judgment, Decision, and Order from this Court to restrain, enjoin, and annul the Vaccination Order issued by the Health Commissioner, which was issued without a delegation of such authority from the Legislature.

15.     Petitioner also notes that no such authority has been delegated to the Health Commissioner by the City Council, although as detailed hereinafter, the City Council is without the authority to enact the Vaccination Order under the Public Health Law, and such delegation by the City Council would be ineffective.

16.     Petitioner also notes, upon information and belief, that no authority for the Vaccination Order has been delegated to the Health Commissioner by the New York City Board of Health (the "Board"); and that, even if the Board did authorize the Health Commissioner to issue the Vaccination Order, the mandatory vaccination of certain adults,

including Petitioner, is beyond the mandate of the Board of Health. *Garcia v. N.Y.C. Dep't of Health & Mental Hygiene* (2018 NY Slip Op 04778, ¶ 9, 31 N.Y.3d 601, 621, 81 N.Y.S.3d 827, 842, 106 N.E.3d 1187, 1202).

17.     The fact that the Legislature has not delegated this authority to the Health Commissioner (or the Board, or the City Council) does not require protracted analysis of legislative intent. The Legislature clearly and explicitly reserved this power to itself. *See*, Pub. Health Law § 206 (1) (l), and *Garcia, id.*.

18.     It is abundantly clear by now that the Vaccination Order is not a limited emergency health measure to prevent the spread of COVID by city employees having significant contact with the public, or by those city workers in contact with a particularly vulnerable population. The Vaccination Order applies with equal force to City employees having little or no contact with the public, and does not apply to non-City employees who may have extensive public contact.

19.     The Vaccination Order is part of an overall scheme by the executive branch of City government "to motivate, compel, coerce, or whatever other adjective may exist, a population to receive a vaccination not mandated by its state government." (Decision and Order, *I.R.O.A.R. et al v. De Blasio*, Index No.: 85155/2021, ECF Doc. # 13, pp. 6 – 7, **EXHIBIT 3**.) The Vaccination Order, in conjunction with the Mayor's Emergency Executive Order 225, et seq. ("KEY TO NYC") which subjects millions of private citizens to penalties for failing to submit to the COVID vaccine (while excluding millions of others) demonstrates the intent of the Respondents to compel the vaccination of any group of citizens whom the Respondents have the ability to coerce.

20.     Separately, the issuance of the Vaccination Order by City government is preempted by State law. Unlike the powers reserved to the states under the Tenth Amendment

to the Constitution, City government has no reserved, or "common law" authority, other than the authority that it derives from the State of New York.

21.      In addition, the Vaccination Order violates the civil and Constitutional rights of Petitioner, including, but not limited to, Petitioner's rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution; as well as the civil and Constitutional rights of other New York City employees.

## **NATURE OF THE ACTION**

22.      Petitioner brings this hybrid action as an Article 78 proceeding in the nature of prohibition, pursuant to the New York State Civil Practice Law and Rules ("CPLR") §7803 (2), and as an action for Declaratory Judgment pursuant to CPLR § 3001 and 42 USC § 1983.

23.      Petitioner is seeking a Temporary Restraining Order that Respondents be enjoined and restrained from enforcing the Vaccination Order, and other orders implementing the Vaccination Order, until the Court has rendered a decision on the merits of Petitioner's claims/causes of action.

24.      Petitioner is further seeking an Order from this Court that Respondents Show Cause why the Court should not issue an Order preliminarily enjoining and retraining Respondents from enforcing the Vaccination Order, granting Petitioner limited expedited discovery; and ultimately a Decision, Judgment and Order from this Court permanently enjoining and retraining Respondents from enforcing the Vaccination Order.

25.      In addition, Petitioner is seeking a Declaratory Judgment that the Vaccination Order is in violation of Petitioner's civil and Constitutional rights including, but not limited to

Petitioners' rights under the First, Fifth, and Fourteenth Amendments of the United States Constitution, specifically including Petitioners' right to due process.

26.     In addition, or in the alternative, Petitioner is seeking a Declaratory Judgment that the issuance of the Vaccination Order by the Health Commissioner violates the principle of Separation of Powers embodied in the United States Constitution (specifically Article 1), and the Constitution of the State of New York ("NY Const."): "The legislative power of this state shall be vested in the senate and assembly." NY Const Art III, § 1.

27.     In addition, or in the alternative, Petitioner is seeking a Declaratory Judgment that the issuance of the Vaccination Order by the Health Commissioner violates the principle of preemption by the State of New York over local authority; in that, the New York State Senate and Assembly have enacted vaccine legislation, as well as "COVID" specific legislation, and have not delegated authority for the Vaccination Order to local government.

28.     Neither the City of New York, the Mayor, the Health Commissioner, the Police Commissioner, the Board, nor any executive, agency, or body of local government has been delegated the authority to issue the Vaccination Order.

29.     Furthermore, the Vaccination Order is not merely *ultra-vires*, but the Vaccination Orders clearly contravene the plain language of certain Federal, State, and local laws, specifically including the New York Executive Law, the New York Public Health Law, and the New York City Administrative Code.

30.     The Vaccination Order mandates, inter alia, as follows:

No later than 5pm on October 29, 2021, all City employees, except those employees described in Paragraph 5, must provide proof to the agency or office where they work that:

a.   they have been fully vaccinated against COVID-19; or

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 9 of 91

    b.   they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or

    c.   they have received the first dose of a two-dose COVID-19 vaccine

      Any City employee who has not provided the proof described in Paragraph 2 must be excluded from the premises at which they work beginning on November 1, 2021.

(**EXHIBIT 1.**)

      The Supplemental Order mandates, inter alia, as follows:

    1.   The requirements of my Order of October 20, 2021, relating to a vaccination requirement for City employees and human services contractors of City agencies, are continued and incorporated herein.

(**EXHIBIT 2.**)

31.     To be clear, Petitioner is not challenging any of the now expired COVID-19 Executive Orders of the Governor of the State of New York, issued pursuant to the emergency authority granted to the Governor by New York State Senate Bill No. S7919, and New York State Assembly Bill No. A09953, which amended §§ 20 & 29-a, of the New York Executive Law and expired on April 30, 2021.  (S7919, A09953, § 4: "This act shall take effect immediately and sections one and two of this act shall expire and be deemed repealed April 30, 2021.")  (**EXHIBIT 4.**)

32.     The emergency authority delegated to the Governor was never extended to the Mayor or the City government, and has, in any event, expired.  "The New York State legislature

8

amended the New York State Executive Law in March 2020 granting the **governor** alone with additional emergency executive powers to take affirmative steps generally seen as legislative in nature." (**Emphasis in Original**.) "The legislation passed by New York's legislature did not imbue local executive branches throughout New York State with any additional powers-- including the Mayor of New York City. Similarly, the New York City Council did not pass any authority conveying unilateral regulatory authority onto the Mayor of New York City." (*Decision and Order, I.R.O.A.R. et al v. De Blasio*, Index No.: 85155/2021, ECF Doc. # 13, p. 12, **EXHIBIT 3**.)

33.     Petitioner is challenging the Vaccination Order and the Supplemental Order (collectively, the "Vaccination Orders") issued by the Health Commissioner of NYC that compel the Petitioner and other City employees to submit to an experimental COVID-19 vaccine, subjecting him to risk of injury and irreparable harm, while providing minimal, or no health benefit to Petitioner or anyone else.

34.     Petitioner is a Detective employed by the NYPD, who has been infected with, and recovered from COVID, as demonstrated by nasal swab test (**EXHIBIT 5**), and has developed "Antibodies against the SARS-CoV-2 spike protein", as demonstrated by blood test. (**EXHIBIT 6**.)

35.     The Vaccination Order cites, as justification, an unspecified "study by Yale University" that allegedly "demonstrated that the Department's vaccination campaign was estimated to have prevented about 250,000 COVID-19 cases, 44,000 hospitalizations, and 8,300 deaths from COVID-19 infection since the start of vaccination through July 1, 2021". (**EXHIBIT 1**.)

36.     The Vaccination Order fails to mention that "While vaccinations are highly effective at protecting against infection and severe COVID-19 disease, our review demonstrates

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 11 of 91

that natural immunity in COVID-recovered individuals is, at least, equivalent to the protection afforded by full vaccination of COVID-naïve populations."[1]

37.     The Vaccination Order was not ordered by Respondent Police Commissioner, in the lawful exercise of his authority over the NYPD, although Respondent Police Commissioner has issued multiple orders implementing the unlawful Vaccination Order against members of service (sworn officers, detectives, and supervisors) of the New York City Police Department ("NYPD").  (See, e.g., Operations Order No. 48 COVID-19, Non-Compliance Leave Without Pay Property Guidelines, **EXHIBIT 7**.)

38.     The Respondents obviously recognize that the Vaccination Orders are not within the scope of the City's authority as Petitioner's employer, hence the necessity of the alleged "Public Health Emergency" and the issuance of the Vaccination Orders by the Health Commissioner, affecting City employees not under the Health Commissioner's chain of command.

39.     Sixteen days ago, on November 6, 2021, the Fifth Circuit Court of Appeals stayed a vaccine mandate imposed by the executive branch of the United States government (the Occupational Safety and Health Administration [OSHA], United States Department of Labor), stating: "Because the petitions give cause to believe there are grave statutory and constitutional issues with the Mandate, the Mandate is hereby STAYED pending further action by this court."  *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698 (5th Cir. Nov. 12, 2021).

---

[1] "Equivalency of Protection from Natural Immunity in COVID-19 Recovered Versus Fully Vaccinated Persons: A Systematic Review and Pooled Analysis", Mahesh B. Shenai, Ralph Rahme, Hooman Noorchashm
https://doi.org/10.1101/2021.09.12.21263461

40.     Likewise, the present Vaccination Orders issued by the Health Commissioner raise grave statutory and constitutional issues, implicating Petitioner's civil and Constitutional rights, separation of powers, and preemption.

41.     Ten days ago, November 12, 2021, the Fifth Circuit granted petitioners' motion for a Stay pending review, issuing a detailed Opinion.  While the Fifth Circuit's Opinion included certain law specific to OSHA, much of the Court's reasoning applies equally to the present mandate, e.g. "concerns over separation of powers principles cast doubt over the Mandate's assertion of virtually unlimited power to control individual conduct under the guise of a workplace regulation."  *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698 (5th Cir. Nov. 12, 2021).

42.     Of course, the principles at stake when it comes to the Mandate are not reducible to dollars and cents. The public interest is also served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions—even, or perhaps particularly, when those decisions frustrate government officials. *Id.,* at 25-26.

43.     The Separation of Powers is a fundamental principal of democratic government that predates the founding of this country.  William Blackstone argued that when "the right both of making and of enforcing the laws . . . are united together, there can be no public liberty." 1 W. Blackstone, Commentaries on the Laws of England 142 (1765).  This principal was enshrined in the United States Constitution (e.g. Article I, Section 1, "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives"), as well as the Constitution of the State of New York ("The legislative power of this state shall be vested in the senate and assembly."  NY Const Art III, § 1.)

## **THE PARTIES**

44.     Petitioner Anthony Marciano is an individual residing in the State of New York, and employed by the New York City Police Department seeking permission to file under a pseudonym to protect his confidential health information and status.

45.     Respondent BILL DE BLASIO, MAYOR OF THE CITY OF NEW YORK, in his official capacity, is the chief executive officer of the City of New York, and upon information and belief has pressured or encouraged the Health Commissioner to issue the Vaccination Order.

46.     Respondent DAVE A. CHOCKSHI, COMMISSIONER OF HEALTH AND MENTAL HYGIENE, in his official capacity, is the chief executive officer of the New York City Department of Health and Mental Hygiene, and issued, signed, and promulgated the Vaccination Order, and the Supplemental Order without lawful authority.

47.     Respondent DERMOT SHEA, POLICE COMMISSIONER, in his official capacity, is the chief executive officer of the New York City Police Department, and is responsible for the implementation and enforcement of the Vaccination Order as against Petitioner and all other employees of the NYPD.

48.     Respondent THE NEW YORK CITY BOARD OF HEALTH consists of the Health Commissioner and ten other members appointed by the Mayor (NYC Charter § 553 [b]) "with the advice and consent of the council after a public hearing."  NYC Charter § 31.

49.     Respondent THE CITY OF NEW YORK is a municipal corporation in the State of New York encompassing the Counties of Bronx, Kings, New York, Queens, and Richmond.

## **JURISDICTION AND VENUE**

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM          INDEX NO. 160914/2021
NYSCEF DOC. NO. 1          Case 1:21-cv-10752-JSR-BCM     Document 5-1     Filed 12/16/21     Page 14 of 91     RECEIVED NYSCEF: 12/06/2021

13

50.     This Court has jurisdiction over this Article 78 proceeding pursuant to CPLR §

301, and CPLR § 7804 because Petitioner Anthony Marciano is a resident of the State of New

York, and all defendants are residents of the City of New York, and the State of New York.

51.     This Court has jurisdiction over Petitioner's claims pursuant to 42 USC § 1983.

*Tafflin v. Levitt*, 493 U.S. 455, 456, 110 S. Ct. 792, 794 (1990); (see also, *McKinney v. New*

*York*, 78 A.D.2d 884, 885, 433 N.Y.S.2d 193, 195 [App. Div. 1980]: "State courts, however,

have concurrent jurisdiction with the Federal District Courts over actions brought under section

1983 of title 42 of the United States Code.").

52.     This Court is the proper venue for this proceeding pursuant to CPLR § 504 (3)

and CPLR § 7804 (b), because the cause of action arose in the County of New York.

53.     This Court is authorized to award Petitioners Attorney's Fees pursuant to 42

USC § 1983 (b).

54.     This Court is authorized to grant the injunctive relief requested pursuant to

CPLR § 3001 and 28 U.S.C.S. § 2201.

55.     Petitioner has no adequate remedy at law.

56.     Petitioner has made no prior application for the relief requested.

**FACTUAL BACKGROUND**

**I.     THE PURPORTED EMERGENCY**

57.     The background of this proceeding is the discovery and identification of the

coronavirus disease ("COVID"), which was first identified in China in 2019.

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 15 of 91

58.     On March 2, 2020, the New York State Legislature temporarily amended New

York Executive Law § 20, by adding the following: "The governor, by executive order, may

issue any directive during a state disaster emergency declared in the following instances: fire,

flood, earthquake, hurricane, tornado, high water, landslide, mudslide, wind, storm, wave

action, volcanic activity, epidemic, disease outbreak, [etc.]  Any such directive must be

necessary to cope with the disaster and may provide for procedures reasonably necessary to

enforce such directive."  (**EXHIBIT 4.**)

59.     While the Legislature did delegate broad emergency authority to the Governor

to issue directives by executive order during disasters (including volcanic activity) it did not

delegate any emergency authority to the Respondents.

60.     On March 7, 2020, with a total of 76 cases in New York State, Governor

Andrew Cuomo declared a state of emergency.

61.     On April 30, 2021, the amendments to the emergency authority of the Governor

under Executive Law § 20 expired.  (**EXHIBIT 4.**)

62.     On June 23, 2021, Governor Andrew Cuomo announced that the state of

emergency would end on June 24, 2021.

63.     On June 24, 2021, Governor Andrew Cuomo issued Executive Order 210,

officially rescinding Executive Orders 202 and 205, relating to the coronavirus emergency.

64.     On March 12, 2020, Respondent de Blasio, in his official capacity as Mayor of

the City of New York, issued Emergency Executive Order 98 ("EEO 98"), stating, "A state of

emergency is hereby declared to exist within the City of New York."

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 16 of 91

65.     The state of emergency was originally declared by Respondent Mayor de Blasio at a time when the origin, associated dangers, and manner to control the coronavirus were all largely unknown, and cases were precipitously rising such that the health and welfare of the entire City was perceived to be in jeopardy and at risk.  Respondent de Blasio has continuously extended EEO 98, for more than eighteen months, long since the emergency authority of the Governor has expired, and more than three months after the Governor announced the end of the state of emergency.

66.     COVID-related hospitalizations in New York City peaked on or around March 30, 2020, at about 1,850 daily hospitalizations. The number of daily deaths peaked at slightly above 800 in the first week of April 2020, which was a level of daily deaths caused by a single disease that had not been seen for at least a century in the City.[2]

67.     The number of deaths and hospitalizations has dropped precipitously since the first few months of the COVID pandemic in the City.

68.     At the present time, the origin and manifestations of the coronavirus are becoming clearer, the associated dangers of the coronavirus, like most other illnesses, are now well known, and cases continue to fall to levels far smaller than the levels that existed at the time and in the immediate aftermath of the issuance of Emergency Executive Order 98.

69.     It has since been learned that many of the COVID deaths in the City (and New York State overall) in the Spring of 2020 resulted from a since-decried March 2020 Executive Order of Governor Andrew M. Cuomo, which required nursing homes to take in

---

[2] NYC Department of Health website, https://www1.nyc.gov/site/doh/covid/covid-19-data-trends.page#epicurve

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 17 of 91

known COVID-infected patients among the most vulnerable population of extremely elderly and those with co-morbidities. Between March 25 and May 8, 2020, approximately 6,326 COVID-positive patients were admitted to nursing homes, according to a state health department report, as revised, dated February 11, 2021.[3]

70.     Unsurprisingly, the number of COVID-related hospitalizations and deaths in the City declined substantially once said official policy was rescinded.

71.     "[O]n March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect". (Vaccination Order, **EXHIBIT 1**.)

72.     Seventeen months later, "on October 20, 2021, [the Health Commissioner] issued an Order requiring city employees and human services contractors of city agencies provide proof of COVID-19 vaccination no later than October 29, 2021". (**EXHIBIT 2**.)

73.     On October 31, 2021, the Health Commissioner issued the Supplemental Order of the Commissioner of Health and Mental Hygiene to require Covid-19 Vaccinations for City Employees and Employees of Certain City Contractors. (**EXHIBIT 2**.)

74.     Respondent Police Commissioner has issued multiple orders implementing the unlawful Vaccination Orders against members of service (sworn officer, detectives, and

---

[3] NYS Department of Health, "Factors Associated with Nursing Home Infections and Fatalities in New York State During the COVID-19 Global Health Crisis" https://www health ny.gov/press/releases/2020/docs/nh factors report.pdf.

supervisors) of the NYPD. (See, e.g., Operations Order No. 48 COVID-19 Non-Compliance Leave Without Pay Property Guidelines, **EXHIBIT 3**.)

75.     Upon information and belief, as of the date of this Petition, the New York City Board of Health has neither continued nor rescinded the Commissioner's "exercise of power", as required by § 3.01 (d) of the NYC Health Code. 24 RCNY 3.01.

76.     As of November 17, 2021, the seven-day average of COVID-19 positive tests was less than 2 %, with 1 851 total confirmed cases, 280 probable cases, 23 hospitalizations, and 6 confirmed deaths.[4]

77.     As noted by the Hon. Lizette Colon, J.S.C. in *Independent Restaurants Owners Assoc et al v. Bill DeBlasio Mayor et al.* (Index No.: 85155/2021) "The New York City Administrative Code defines the instances where a mayor *may* declare a localized state of emergency within New York City. The relevant portion of the code reads in its totality:

> Whenever the mayor determines that there has been an act of violence or a flagrant and substantial defiance of or resistance to a lawful exercise of public authority, and that, partly on account thereof, there is reason to believe that there exists a clear and present danger of a riot or other general public disorder, widespread disobedience of the law, and substantial injury to persons or to property, all of which constitutes a threat to public peace or order and to the general welfare of the city or part or parts thereof, the mayor may declare that a state of emergency exists within the city or any part of parts thereof. NYC Admin Code § 3-104

78.     The Hon. Lizette Colon, further observed, "The current pandemic status, despite its worldwide impact, does not seem to meet the first element necessary to declare a

---

[4] NYC Department of Health website, https://www1.nyc.gov/site/doh/covid/covid-19-data.page#sum.

state of emergency under the quoted language of New York City's code ("an act of violence or a flagrant and substantial defiance of or resistance of a lawful exercise of public authority..."). The government seems to acknowledge this point in the language it chose to justify the authority when it issued Emergency Executive Order No. 225:" (See Decision and Order, *I.R.O.A.R. et al v. De Blasio*, Index No.: 85155/2021, ECF Doc. # 13, pp. 6 – 7, **EXHIBIT 6**.)

79.    Based on data reported by the NYC Health Department on November 17, 2021, there were, at most, 1,131 confirmed and probable COVID cases in the City, approximately than .013 % of the population.[5]  This infection rate is less than one-third of the infection rate of measles in *W.D. ex rel. A. & J. v. Cnty. of Rockland*., wherein the Hon. Rolf Thorsen, J.S.C., granted Petitioner Parents' requested Order temporarily enjoining Respondent County of Rockland from enforcing the County Executive's order barring unvaccinated children from school (2019 NY Slip Op 29111, 63 Misc. 3d 932, 936, 101 N.Y.S.3d 820, 824 [Sup. Ct.])

80.    The Hon. Rolf Thorsen, J.S.C., found, "[t]he information provided to this court at this early stage in the proceeding indicates that since October 2018 to the present (a six-month period), 'Rockland County has seen 166 cases of measles.'  In a population of roughly 330,000 people, 166 cases is equal to .05% of the population, which does not appear, on the record before the court, to rise to the level of an "epidemic" as included in the definition of "disaster" under Executive Law § 24. Petitioners have thus demonstrated that Mr. Day's reliance on Executive Law § 24 in issuing the emergency declaration may have been misplaced." *W.D. ex rel. A. & J. v. Cnty. of Rockland*, 2019 NY Slip Op 29111, 63 Misc. 3d 932, 936, 101 N.Y.S.3d 820, 824 (Sup. Ct.)

---

[5] "Latest Data", <u>NYC Health Department</u>, https://www1.nyc.gov/site/doh/covid/covid-19-data.page#sum

81.    "On April 16, 2019, the Second Department affirmed the decision on appeal. W.D. v. Cty. of Rockland, No. 31784/2019 (2d Dep't Apr. 19, 2019), NYSCEF No. 45."  W.D. v. Rockland Cnty., 2021 U.S. Dist. LEXIS 33515, at 16 (S.D.N.Y. Feb. 22, 2021).

82.    Respondents Mayor de Blasio and City of New York, in *ROCCO GENEROSO et al v. BILL de BLASIO et al* (Index No.: 528739/2021), currently pending Kings County Supreme Court, submitted the Affirmation of Dr. Jay Varma, dated November 10, 2021, in opposition to petitioners' request for an Order restraining and enjoining the enforcement of the Mayor's Emergency Executive Order 225, et. seq.  (Varma Affirmation, NYSCEF Doc. # 11, **EXHIBIT 8**.)  Respondents Mayor de Blasio and City of New York also submitted the Declaration of Dr. Jay Varma, dated October 5, 2021, in the case of *Dixon et al v. DeBlasio et al* (Case #: 1:21-cv-05090-BMC), currently pending in the United States District Court for the Eastern District of New York.  (Varma Declaration, ECF Doc. # 14, **EXHIBIT 9**.)  The Affirmation and Declaration of Dr. Varma are substantially similar, with the Affirmation being updated to reflect current Orders and statistics.  It is fair to say that the Mayor stands behind sworn assertions of Dr. Varma.

83.    In both his Affirmation and Declaration Dr. Varma identifies himself as "Mayor Bill de Blasio's Senior Advisor for Public Health, and, as of September 1,2027, a Professor of Population Health Sciences at Weill Cornell Medical School."  In both his Affirmation and Declaration, Dr. Varma attests to the following: "While New York City is no longer experiencing the widespread crisis that marked the spring of 2020, community transmission remains an ongoing public health concern."  (NYSCEF Doc. # 11, ¶ 17, **EXHIBIT 8**.)  (PACER, ECF Doc. # 14, ¶ 18, **EXHIBIT 9**.)

19

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 21 of 91

84.     Dr. Varma's honest assessment of COVID as an "ongoing public health concern", and *not* a "widespread crisis", does not support the finding of a "state of emergency", as claimed by the Mayor and the Health Commissioner in justification of the exercise of their extraordinary emergency powers in direct violation of the New York Public Health Law.

85.     Petitioner does not dispute Dr. Varma's expertise and candor.  Dr. Varma's Affirmation and Declaration establish that the Mayor's Emergency Executive Orders along with the Health Commissioner's Vaccination Orders (Collectively the "Vaccine Mandates") are not responses to an emergency, disaster, or epidemic, but are two measures intended to implement the Respondents' broad policy of vaccination of all New York City residents. "Widespread vaccination will reduce the number of cases and the number of severe illness and deaths.  A population that is 100% vaccinated will be largely protected against outbreaks and surges in hospitalizations; however, we do not know the exact level below 100% that is sufficient." (NYSCEF Doc. # 11, ¶ 26, **EXHIBIT 8**.)  (PACER, ECF Doc. # 14, ¶ 26, **EXHIBIT 9**.)

86.     As attested to by Dr. Varma, the goal of the Mayor's Emergency Orders is to increase vaccination rates – further evidence that the Vaccine Mandates are the implementation of a broad public policy requiring the vaccination of as many residents as possible, implemented against individuals and groups over whom Respondents can exert coercive pressure.  This policy goes far beyond the furtherance of a legislative purpose, but was originated in and by the executive branch of the City government, substituting the Executive's judgment for the will of the people as expressed through the Legislature.

87.     The Vaccination Order is one prong of a broad program to increase vaccinations through the use of whatever coercive means are available.  This is not only

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 22 of 91    RECEIVED NYSCEF: 12/06/2021

21

apparent from the Order itself, Dr. Varma has attested to this fact, at least twice: "Based on my experience with infectious disease control principles, the guidelines set forth in the Key to NYC program are important components of a multi-level approach to increasing vaccination rates in New York City, with special attention to a key demographic, and with overall efforts to reduce the spread of COVID -19." (NYSCEF Doc. # 11, ¶ 35, **EXHIBIT 8**.) (PACER, ECF Doc. # 14, ¶ 35, **EXHIBIT 9**.) In footnote 21 to the previous statement in Dr. Varma's Declaration, Dr. Varma notes, "Other efforts by the City to increase vaccinations have included giveaways and a program to provide $100 to organizations who refer individuals to vax4nyc sites for vaccination and a program to pay $100 to individuals who receive their first dose at a vax4nyc site. See NYC COVID-19 Citywide Information Portal, COVID-19 Vaccine Incentives, available at https://www1.nyc.gov/site/coronavirus/vaccines/vaccine-incentives.page (last visited Nov. 8, 2021). The City is also requiring that City and school employees obtain the COVID-19 vaccine." (PACER, ECF Doc. # 14, Footnote 21, **EXHIBIT 9**.)

88.    The indefinite extension of rule by decree to address "an ongoing public health concern", long after the worst of any purported "disaster" has past, is a threat to "public liberty" that outweighs the lingering threat of COVID. In the City of New York, it seems unlikely that there will ever be a period of time in which there is no ongoing public health concern.

## II.    PETITIONER POSSESSES NATURAL IMMUNITY

89.    Petitioner is a New York City Police Detective, having served the people of the City of New York for over ten years, with a distinguished record, and multiple commendations, specifically including two separate awards from the NYPDs Integrity Review Board, and a promotion to Detective.

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 23 of 91

90.     Petitioner served the City through the worst of the purported pandemic, without vaccination, for which he his coworkers were hailed as heroes.

91.     In March of 2020, Petitioner and 38 other investigators from his unit contracted COVID, as demonstrated by laboratory testing.  (**EXHIBIT 5**.)

92.     Petitioner recovered, and continued to serve the public for over a year and a half without being vaccinated, and without being reinfected.

93.     Petitioner developed and retains a natural immunity to COVID, as demonstrated by recent blood testing.  (**EXHIBIT 6**.)

94.     Relevant to the present matter, the Fifth Circuit noted, "Likewise, a naturally immune unvaccinated worker is presumably at less risk than an unvaccinated worker who has never had the virus."  *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698 (5th Cir. Nov. 12, 2021).

95.     The Vaccination Order requires that "Any City employee who has not provided the proof described in Paragraph 2 must be excluded from the premises at which they work beginning on November 1, 2021."  (**EXHIBIT 1**.)

96.     Accordingly, Petitioner is no more of a risk (probably less) for contracting or spreading COVID than a vaccinated person, and there is no rational relationship between the requirement that Petitioner submit to the vaccine and the stated purpose "to prevent the spread of COVID-19".  (**EXHIBIT 1**.)

97.     In fact, the exclusion from work under ¶ 3 of the Vaccination Order does not apply to City employees who prove "they have received the first dose of a two-dose COVID-19 vaccine" (Vaccination Order, ¶ 2 (c), **EXHIBIT 1**.)  Thus, Petitioner may be excluded from work, while employees having received the first dose of a two-dose vaccine, possessing virtually no immunity, will not be excluded.  "First, the protection doesn't kick in until at least day 12 – until then, there was no difference between the two groups [the vaccinated and the unvaccinated]."[6]

98.     The first COVID vaccine became available in December of 2020, less than one year ago, and there are no studies yet regarding the long-term effects of the vaccine.

### The Vaccinated Have Nothing to Fear

99.     Vaccinated individuals have very little to fear with respect to COVID-19, if Respondents are correct in innumerable pronouncements and/or admissions they have made and/or expressly adopted.

100.    Specifically, the Vaccination Order includes the following statements:

> **WHEREAS**, the Department reports that between January 17 and August 7, 2021, people who were unvaccinated or not fully vaccinated accounted for 96.1% of COVID-19 cases, 96.9% of COVID-19 hospitalizations, and 97.3% of COVID-19 deaths in New York City; and

> **WHEREAS,** a study by Yale University demonstrated that the Department's vaccination campaign was estimated to have prevented about 250,000 COVID-19 cases, 44,000 hospitalizations, and 8,300 deaths from COVID-19 infection since the start of vaccination through July 1, 2021, and by information and belief, the number of prevented cases, hospitalizations, and death has risen since then; and

> **WHEREAS,** on August 16, 2021, Mayor de Blasio issued Emergency Executive Order No. 225, the "Key to NYC," requiring that patrons and employees of establishments providing indoor entertainment, dining, and gyms and fitness

---

[6] "IMMUNE RESPONSE | COVID-19, How effective is a single vaccine dose against Covid-19", BBC, https://www.bbc.com/future/article/20210114-covid-19-how-effective-is-a-single-vaccine-dose.

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 25 of 91

centers must show proof that they have received at least one dose of an approved COVID-19 vaccine, and such Order, as amended, is still in effect;

101.    The Mayor's Emergency Executive Order 225 (referenced in the Vaccination Order) also cited the "study by Yale University" for demonstrating that "between January 1, 2021, and June 15, 2021, over 98% of hospitalizations and deaths from COVID-19 infection involved those who were not fully vaccinated".  (Emergency Executive Order 225, **EXHIBIT 10**.)

102.    Extrapolating from Respondents' own numbers, less than one present hospitalization can be expected to be a vaccinated individual.

## THE UNLAWFUL VACCINATION ORDERS

### I.    PETITIONER'S STANDING TO CHALLENGE THE VACCINATION ORDERS

103.    Petitioner is a City Employee and a member of the NYPD refusing voluntary consent to the COVID vaccination.

104.    The Vaccination Order is not a proper subject of collective bargaining under the Taylor Law, because the Vaccination Orders clearly violate Petitioner's Constitutional and civil rights, as well as numerous New York State statutes, as detailed hereinafter.

105.    "In the Syracuse case, it was said that "collective bargaining under the Taylor Law (Civil Service Law, § 204, subd 1) has broad scope with respect to the terms and conditions of employment, limited by plain and clear, rather than express, prohibitions in the statute or decisional law". *Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Asso.*, 37 N.Y.2d 614, 616, 376 N.Y.S.2d 427, 429, 339 N.E.2d 132, 133 (1975)

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 26 of 91

106.    The public employer's power to bargain collectively, while broad, is not unlimited. Although a public employer is free to negotiate any matter in controversy, whether or not it involves a term or condition of employment subject to mandatory bargaining, it may do so only in the absence of "plain and clear" prohibitions in statute or controlling decision law, or restrictive public policy (see *Matter of Susquehanna Val. Cent. School Dist. at Conklin* [*Susquehanna Val. Teachers' Assn*.], 37 NY2d 614, 616-618; *Syracuse Teachers Assn. v Board of Educ.*, 35 NY2d 743, 744; *Board of Educ. v Associated Teachers of Huntington*, 30 NY2d 122, 130, supra). *Bd. of Educ. v. Yonkers Fed'n of Teachers*, 40 N.Y.2d 268, 273-74, 386 N.Y.S.2d 657, 659, 353 N.E.2d 569, 572 (1976).

107.    "The scope of our review is well settled. We accord deference to PERB, as the agency charged with implementing the Taylor Law (Civil Service Law art 14), as to matters falling within the agency's special competence developed in administering the statute--whether, for example, a particular matter is a term or condition of employment *(see, Matter of Board of Educ. v New York State Pub. Empl. Relations Bd.,* 75 NY2d 660, 667, *supra,* citing *Matter of West Irondequoit Teachers Assn. v Helsby,* 35 NY2d 46, 50; *Matter of Rosen v Public Empl. Relations Bd.,* 72 NY2d 42, 47).  Deference to PERB is not required, however, if the issue is one of statutory interpretation, dependent on discerning legislative intent, as statutory construction is the function of the courts" *( Matter of Rosen v Public Empl. Relations Bd.,* 72 NY2d, at 47-48, *supra), Newark Valley Cent. Sch. Dist. v. Pub. Emp't Relations Bd.*, 83 N.Y.2d 315, 320, 610 N.Y.S.2d 134, 136, 632 N.E.2d 443, 445 (1994).

108.    Furthermore, the Vaccination Orders are not "terms and conditions of employment".  The Vaccination Orders were not issued by the Police Commissioner, with respect to employees of the NYPD, relating to the management and supervision of the Police

Department.  The Vaccination Orders were issued by the Health Commissioner as "necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency".  (**EXHIBIT 1**.)

## I.     SEPARATION OF POWERS

109.     The Vaccination Orders are an integral component of a comprehensive scheme by which the executive branch is attempting to legislate a general vaccination mandate through executive orders, in usurpation of the power vested in the legislative branch of government.

110.     This existence of this scheme cannot be seriously doubted.  It is acknowledged in detail in the Vaccination Order: "on August 16, 2021, Mayor de Blasio issued Emergency Executive Order No. 225, the "Key to NYC," requiring that patrons and employees of [numerous] establishments…must show proof (the "Vaccine Passport") that they have received at least one dose of an approved COVID-19 vaccine", "on August 24, 2021, I [the Health Commissioner] issued an Order requiring that Department of Education employees, contractors, and visitors provide proof of COVID-19 vaccination", "on August 26, 2021, the New York State Department of Health adopted emergency regulations requiring staff of inpatient hospitals and nursing homes to receive the first dose of a COVID-19 vaccine by September 27, 2021, and staff of diagnostic and treatment centers, hospices, home care and adult care facilities to receive the first dose of a COVID-19 vaccine by October 7, 2021", "on August 31, 2021, Mayor de Blasio issued Executive Order No. 78, requiring that, beginning September 13, 2021, City employees and covered employees of City contractors be vaccinated against COVID-19 or submit on a weekly basis proof of a negative COVID-19 PCR diagnostic test",  and "on September 9, 2021 President Biden issued an Executive Order stating that "It is essential that

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM                INDEX NO. 160914/2021
NYSCEF DOC. NO. 1       Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 28 of 91   RECEIVED NYSCEF: 12/06/2021

27

Federal employees take all available steps to protect themselves and avoid spreading COVID-19 to their co-workers and members of the public," and ordering each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law". (Vaccination Order, **EXHIBIT 1**.)

111.    In the most recent overreach of executive authority, President Biden has directed the Secretary of Labor, through OSHA, to issue an "Emergency Temporary Standard (the "Mandate")" that "requires all employers of 100 or more employees to 'develop, implement, and enforce a mandatory COVID-19 vaccination policy' and require any workers who remain unvaccinated to 'undergo [weekly] COVID-19 testing and wear a face covering at work in lieu of vaccination.' 86 Fed. Reg. 61,402, 61,402." *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698, pp. 3-4 (5th Cir. Nov. 12, 2021.)

112.    "The President announced his intention to impose a national vaccine mandate on September 9, 2021." (Internal citations omitted.) "We've been patient, but our patience is wearing thin…" (*Id*. footnote 11, p. 7.) The invocation of the royal "We", is ominous, but appropriate.

113.    The Fifth Circuit noted, "the Article II executive [cannot] breathe new power into OSHA's authority—no matter how thin patience wears." (*Id*. p. 18.)

114.    The Mayor clearly believes vaccination should be required for all New York City residents. He has said so.

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM                    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1        Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 29 of 91   RECEIVED NYSCEF: 12/06/2021

28

115.    Governor Hochul believes so strongly in the vaccine requirement that she is willing to fire nurses and other "front line" healthcare workers for failing to get vaccinated. "'Vaccine requirements work in getting people to do the right thing, and all professionals in health settings must take every basic precaution against COVID-19, including the vaccine, so they do not spread the virus to the people coming in for treatment,' Governor Hochul said."[7] This is despite the concession from the CDC that COVID vaccines do not stop the spread of the virus.[8]

116.    The people that we celebrated as heroes for working in hospitals through the worst of the "pandemic" without being vaccinated, are now being vilified and terminated from their profession for refusing to be vaccinated.  The Governor is even willing to terminate nurses – the very people most essential to handle serious COVID cases, who refuse the vaccine, despite a critical shortage in this profession.

117.    An extremely high number of these medical professionals have suffered loss of employment in preference to vaccination.

118.    Surprisingly, neither the Governor, nor the Mayor, has mandated vaccines for the general public.  This can only be because they recognize that they lack the authority to do so.

---

[7] "Governor Hochul Expands Vaccine Mandate to Include Staff in OMH and OPWDD Hospital Settings", https://www.governor.ny.gov/news/governor-hochul-expands-vaccine-mandate-include-staff-omh-and-opwdd-hospital-settings.

[8] *See* https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid.html (last visited November 7, 2021) (stating "what [the vaccines] can't do anymore is prevent transmission").

119.     Instead, the Respondents have mandated vaccinations for those individuals and groups against whom they have the ability to impose punitive measures for non-compliance, in direct proportion to the ability to punish them.  There can be no other explanation for the imposition of a vaccine mandate for private citizens owning or patronizing "covered businesses" under EEO 225, and City employees (with a delayed date for uniformed Department of Corrections ("DOC") employees – who work almost exclusively in crowded, indoor facilities).

120.     The New York State Legislature has not enacted legislation mandating COVID vaccination, although various bills have been proposed and considered by the legislature.

For example:

Assembly Bill A11179 provides, in part, "If public Health Officials determine that residents of the State are not developing sufficient immunity from COVID-19, the department shall mandate vaccination for all individuals or groups of individuals who, as shown by clinical data, are proven to be safe to receive such vaccine."

Notably, the proposed Assembly Bill A11179 would also provide, "any individual who has received a medical exemption from a medical professional shall not be mandated to receive the COVID-19 vaccine and shall be excluded from the requirements of this section."

121.     Assembly Bill A11179, mandating vaccination under certain circumstances, and with certain exemptions, was proposed on December 4, 2020, and has not been passed by the Assembly.

122.     In fact, the vast majority of bills being considered by the New York State Legislature would prohibit, or limit vaccination mandates:

Assembly Bill 4602 would prohibit mandatory vaccination as a condition of employment.

Senate Bill 2677 would provide a religious exemption to vaccination requirements for school attendance…

Senate Bill 2678 would amend the existing medical exemption to mandatory vaccinations to protect providers against allegations of misconduct for failing to immunize an individual or for certifying that immunization would be detrimental to a patient's health.

Senate Bill 6747 would prohibit public or private education institutions or day care facilities from mandating COVID-19 vaccinations of children, incapacitated persons, students, or staff.

Assembly Bill 7100 would create a vaccine bill of rights that prohibits mandatory COVID-19 vaccinations.

123.       The essential point is that the Vaccination Mandates are not emergency measures to deal with impending disaster necessitated by the inability of the Senate and Assembly to enact COVID Legislation.

124.       The Senate and Assembly have enacted COVID legislation.  (See, Title 8 NOVEL CORONAVIRUS, COVID-19 [§§ 2180 — 2182], effective on December 23, 2020.)

125.       In fact, the effective date of the COVID legislation is after the date the COVID vaccine became available, and long after the vaccine was discovered.  The lack of a statutory COVID vaccine mandate reflects the deliberate decision of the Senate and Assembly not to enact such a mandate.

126.       According to the U.S. Food and Drug Administration, "Since Dec. 11, 2020, the Pfizer-BioNTech COVID-19 Vaccine has been available under EUA in individuals 16 years of age and older."[9]

---

[9] "**FDA Approves First COVID-19 Vaccine**" https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 32 of 91

127.	The Vaccine Mandates are the result of the executive branch usurping the legislative function, because the Respondents disapprove of the deliberate decision by the Senate and Assembly of the State of New York not to enact mandatory vaccine legislation. This is among the greatest evils that the U. S. Constitution and the New York State Constitution seek to prevent.  When the executive usurps legislative authority, it is the ultimate duty of the judicial branch to check this abuse and uphold the balance of power guaranteed by the Constitution.

128.	There has been no vaccine mandate enacted by the New York City Council. Whether or not the City Council has the authority to do so is questionable.

129.	Whether or not the authority of the Health Commissioner to legislate by decree exceeds the full legislative authority of the City of New York, which is vested in the City Council, is not questionable.

130.	Even granting the Health Commissioner's claim to be exercising the full authority of the Board of Health, he has exceeded that authority.

131.	The Board of Health is not authorized to require the vaccination of adults, other than the authority to require the vaccination of post-secondary students.  PHL § 2165. "[T]he council shall be vested with the legislative power of the city."  NYC Charter 21. (*See*, *Matter of N.Y. Statewide Coal. of Hispanic Chambers of Commerce v. N.Y.C. Dep't of Health & Mental Hygiene*, 2014 NY Slip Op 4804, ¶ 4, 23 N.Y.3d 681, 694, 992 N.Y.S.2d 480, 486, 16 N.E.3d 538, 544; "Respondents, however, contend that the Board of Health is a unique body that has inherent legislative authority. We disagree.")

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 33 of 91

32

132.    "The City Charter unequivocally provides for distinct legislative and executive branches

of New York City government. The City Council is the sole legislative branch of City

government; it is "*the* legislative body of the city. . . . vested with the legislative power of

the city" (NY City Charter § 21 [emphasis added]; *accord Under 21, Catholic Home Bur.*

*for Dependent Children v City of New York*, 65 NY2d 344, 356, 482 NE2d 1, 492 NYS2d

522 [1985]; *Subcontractors Trade Assn v Koch*, 62 NY2d 422, 427, 465 NE2d 840, 477

NYS2d 120 [1984])." *Matter of N.Y. Statewide Coal. of Hispanic Chambers of Commerce*

*v. N.Y.C. Dep't of Health & Mental Hygiene*, 2014 NY Slip Op 4804, ¶ 3, 23 N.Y.3d 681,

693, 992 N.Y.S.2d 480, 485, 16 N.E.3d 538, 543.

133.    It seems counterintuitive, if not preposterous, to find that the Board of Health

encroached on the City Council's legislative authority by regulating the size of soda cups,

but is within the bounds of its regulatory mandate in deciding that certain New Yorkers are

required to be vaccinated, and others are not. *Id.*

## II.    PREEMPTION

134.    "'When the State has created a comprehensive and detailed regulatory scheme with

regard to the subject matter that the local law attempts to regulate, the local interest must

yield to that of the State in regulating that field' (*Diack*, 24 NY3d at 677)." *Garcia v.*

*N.Y.C. Dep't of Health & Mental Hygiene*, 2018 NY Slip Op 04778, ¶ 8, 31 N.Y.3d 601,

618, 81 N.Y.S.3d 827, 840, 106 N.E.3d 1187, 1200.

135.    The Public Health Law authorizes a role for "local boards of health and health officers."

(Pub. Health Law § 2100.)  This includes "proper and vigilant medical inspection and

control of all persons and things infected with or exposed to such diseases," and "care and

isolation of cases of communicable disease," and to "prohibit and prevent all intercourse

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 34 of 91    RECEIVED NYSCEF: 12/06/2021

33

and communication with or use of infected premises, places and things." It does not include the authority to mandate the vaccination of adults.

136.     Title VI of the Public Health Law provides a regulatory scheme for "immunization" which specifically authorizes the role of the commissioner (PHL § 2164 [10])., and "every local board of health and every health officer" (PHL § 2160).

137.     Under the NYC Charter, "There shall be a department of health and mental hygiene, the head of which shall be the commissioner of health and mental hygiene who shall be appointed by the mayor. The department shall have and exercise all powers of a ***local health department*** set forth in law." (***Emphasis added***.) NYC Charter § 551

138.     Public Health Law § 2160 provides that "every local board of health and every health officer shall exercise proper and vigilant medical inspection of all persons twenty-one years of age or over, infected or who have been infected with poliomyelitis."

139.     Public Health Law § 2162 specifically includes the NYC Department of Health: "Notwithstanding any other provision of this chapter or any other general, special or local law, the terms "local board of health" and "health officers" as used in sections two thousand one hundred sixty and two thousand one hundred sixty-one of this chapter shall include the department of health of the city of New York."

140.     Public Health Law § 2164 requires that children be administered "an adequate dose or doses of an immunizing agent against poliomyelitis, mumps, measles, diphtheria, rubella, varicella, Haemophilus influenzae type b (Hib), pertussis, tetanus, pneumococcal disease, and hepatitis B."

141.     Public Health Law § 2164 provides exceptions if a physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health. Pub. Health Law § 2164 (8).

33

142.    Public Health Law § 2165 requires post-secondary students to receive "an adequate dose

or doses of an immunizing agent against measles, mumps and rubella."

143.    Public Health Law § 2165 provides exceptions if a physician licensed to practice

medicine in this state certifies that such immunization may be detrimental to the person's

health.  Pub. Health Law § 2165 (8).

144.    Pub. Health Law § 2164 (10) states, "The commissioner [of health of the state of New

York] may adopt and amend rules and regulations to effectuate the provisions and purposes

of this section."

145.    The Legislature specifically limited the commissioner's authority to require vaccination

to Pub. Health Law §§ 264 and 265.

> The commissioner may promulgate such regulations as are necessary for the
> implementation of this paragraph. Nothing in this paragraph shall authorize
> mandatory immunization of adults or children, except as provided in sections
> twenty-one hundred sixty-four and twenty-one hundred sixty-five of this chapter.

Pub. Health Law § 206 (1) (l).  The Legislature did not delegate any authority to require the

vaccination of any adults other than post-secondary students.

146.    The Legislature explicitly reserved to itself the authority to require the vaccination of

any persons, other than those described in Pub. Health Law §§ 264 and 265 (children and

post-secondary students.)  Pub. Health Law § 206 (1) (l)

147.    In 2018 the Court of Appeals addressed Pub. Health Law §§ 264 and 265, and the

limitations imposed by Pub. Health Law § 206 (1) (l), and considered the legislative history

of those sections, as well as other sections of the Public Health Law in *Garcia v. N.Y.C.

Dep't of Health & Mental Hygiene* (2018 NY Slip Op 04778, ¶ 9, 31 N.Y.3d 601, 621, 81

N.Y.S.3d 827, 842, 106 N.E.3d 1187, 1202), and determined that the Public Health Law did

not prohibit flu vaccination for school children: "Accordingly, we cannot conclude that the

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 36 of 91    RECEIVED NYSCEF: 12/06/2021

35

State has preempted the field of mandatory school vaccinations so as to invalidate the

Board's flu vaccine rules."

148.    The Court of Appeals in *Garcia* addressed the preemption argument in detail: "A local

law will be preempted either where there is a direct conflict with a state statute (conflict

preemption) or where the legislature has indicated its intent to occupy the particular field

(field preemption)." (*Id*. at 617.)

149.    The Court of Appeals specifically found that Pub. Health Law § 206 (1) (l) does not

authorize the mandatory vaccination of adults.  "Rather, the legislature intended to grant

NYSDOH authority to oversee voluntary adult immunization programs, while ensuring that

its grant of authority would not be construed as extending to the adoption of mandatory

adult immunizations." *Id*. at 620.

150.    Interpreting the Public Health Law to permit the Health Commissioner to mandate the

vaccination of adults is not only explicitly prohibited by *Garcia*, but would violate the

canons of construction stated by the Court of Appeals": "A construction rendering statutory

language superfluous is to be avoided." *Branford House v. Michetti*, 81 N.Y.2d 681, 688,

603 N.Y.S.2d 290, 293-94, 623 N.E.2d 11, 14-15 (1993).

151.    A decision that the Public Health Law authorizes the mandatory vaccination of any

person, other than a child (PHL § 2164) or a student (PHL § 2165) would completely negate

the plain language PHL § 206 (1) (l): "Nothing in this paragraph shall authorize mandatory

immunization of adults or children, except as provided in sections twenty-one hundred

sixty-four and twenty-one hundred sixty-five of this chapter."

### III.    THE PURPORTED AUTHORITY FOR THE VACCINATION ORDER

#### A.    <u>Section 558 of the New York City Charter</u>

152.    The Health Commissioner cites § 558 of the New York City Charter (the "Charter"), for
the authority of the *Board of Health* to embrace in the Health Code all matters and subjects
to which the power and authority of the Department of Health and Mental Hygiene (the
"Department") extends.

153.    For the reasons stated above, the authority of the Board of Health does not extend to
mandatory immunization of adults, "except as provided in sections twenty-one hundred
sixty-four and twenty-one hundred sixty-five of this chapter."   PHL § 206 (1) (l).
Accordingly, neither the Board of Health, nor the Health Commissioner is authorized by §
558 to require the vaccination of adults (other than students defined in PHL § 2165), be they
city employees, contractors, or anyone else. *Garcia v. N.Y.C. Dep't of Health & Mental
Hygiene*, 31 N.Y.3d 601.

154.    By invoking NYC Charter § 558, the Health Commissioner claims, or at least implies,
that the Health Commissioner is personally exercising the authority of the Board of Health,
pursuant to his declaration of public health emergency.  (Vaccination Order, **EXHIBIT 1**.)
However, as previously demonstrated, the criteria for a public health emergency do not
exist.

155.    Whether or not the Health Commissioner was authorized to declare a public health
emergency on March 25, 2020, the duration of the Health Commissioner's authority to
exercise the powers of the Board is limited by the New York City Health Code:

> Such procedures, orders or actions may include, but are not limited to, exercising
> the Board's authority to suspend, alter or modify any provision of this Code
> pursuant to subdivision b of section 558 of the New York City Charter, or
> exercising any other power of the Board of Health to prevent, mitigate, control
> or abate an emergency, provided that any such exercise of authority or power
> shall be effective only until the next meeting of the Board, which meeting shall
> be held within five business days of the Commissioner's declaration if a quorum
> of the Board can be convened within such time period. If a quorum of the Board

cannot be so convened, then said meeting shall be held as soon as reasonably practicable.

24 RCNY 3.01.

156. The Health Commissioner did not allege any meeting of the Board in his Vaccination Order.  (**EXHIBIT 1**.)

157. The Health Commissioner did not allege any meeting of the Board in his Supplemental Order.  (**EXHIBIT 2**.)

158. Section 555 of the New York City Charter states, "The commissioner shall have all the powers and duties vested in him or in the department by this chapter or otherwise, ***except those vested by law in the board of health*** and the chief medical examiner."  (***Emphasis added***.)

159. Absent the approval of the Board, the Health Commissioner is not authorized to exercise the powers of the Board.

160. The Health Commissioner incorrectly stated the applicable law in his Vaccination Order: "Subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code, this Order shall be effective immediately and remain in effect until rescinded, except that Paragraph 5 of this Order will be deemed repealed on December 1, 2021."  (**EXHIBIT 1**.)  (The Supplemental Order contains similar language, **EXHIBIT 2**.)

161. The Health Commissioner is not authorized to issue permanent Orders (or Orders of indefinite duration) under § 558, and 24 RCNY 3.01.  The Health Commissioner is only authorized to issue Orders until "the next meeting of the Board, which meeting shall be held within five business days…"

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 39 of 91

162.    "At its next meeting, the Board may continue or rescind the Commissioner's suspension, alteration, modification of Health Code provisions or exercise of power."  Health Code § 3.01 (d).

163.    The Commissioner's assertion that his Orders remain in effect until rescinded, is contrary to the Code.  The Board must vote to either rescind or continue his orders.  In the absence of a vote by the Board to continue the Commissioner's Orders, the Orders expire.  *See*, e.g., *C.F. v. N.Y.C. Dep't of Health & Mental Hygiene*, 2020 NY Slip Op 07867, ¶ 3, 191 A.D.3d 52, 58, 139 N.Y.S.3d 273, 278 (App. Div.) ("The orders were to be in effect until the next meeting of the Board of Health of the City Health Department [hereinafter the Board or the Board of Health], scheduled for April 17, 2019, at which time it might be continued or rescinded by the Board.")

164.    Upon information and belief, the Board has not voted to continue the Commissioner's Orders.  There is no reference in any of the Commissioner's Orders to a vote by the Board.  There is no indication on the Department of Health website of a vote by the Board.  The efforts by Petitioner's Counsel to obtain the minutes of any meeting of the Board have been unsuccessful, and as far as can be determined, the Board has not voted to continue the Commissioner's Orders, unless it has done so in secret.

165.    The Board takes action by adding to, altering, amending, or repealing the health code, a process accomplished through a "proposed rule, public hearing on the proposed rule and [] public comments" followed by a vote of the Board.  (See, *Matter of N.Y. Statewide Coal. of Hispanic Chambers of Commerce v. N.Y.C. Dep't of Health & Mental Hygiene*, 2014 NY Slip Op 4804, ¶ 4, 23 N.Y.3d 681, 694, 992 N.Y.S.2d 480, 486, 16 N.E.3d 538, 544.) There has been no such opportunity for public input on the Health Commissioner's Vaccination Order, and the Health Code has not been amended.

166.    "While the Charter empowers the City Council "to adopt local laws . . . for the preservation of the public health, comfort, peace and prosperity of the city and its inhabitants" (NY City Charter § 28 [a]), the Charter restricts the Board's rulemaking to the publication of a health code, an entirely different endeavor." *Matter of N.Y. Statewide Coal. of Hispanic Chambers of Commerce v. N.Y.C. Dep't of Health & Mental Hygiene*, 2014 NY Slip Op 4804, ¶ 4, 23 N.Y.3d 681, 694, 992 N.Y.S.2d 480, 486, 16 N.E.3d 538, 544. Petitioner has been able to find no amendments to the Health Code mandating the vaccination of City Employees.

## B.    Section 558 of the New York City Charter

167.    The Health Commissioner cites § 556 of the New York City Charter and § 3.01(c) of the Health Code, for the authority of the Health Department "to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health." (**EXHIBIT 2**.)

168.    Section 556 of the New York City Charter lists the "Functions, powers and duties of the department."  Nowhere in § 556 are the words vaccination or immunization.

169.    Section 3.01 (c) of the Health Code states, "***Subject to the provisions of this Code*** or other applicable law, the Department may take such action as may become necessary to assure the maintenance of public health, the prevention of disease, or the safety of the City and its residents."  (***Emphasis added***.)  Section 47.25 (a) (2) of the Health Code requires the immunization of children.  The Health Code does not require the immunization of adults.

## C.    The Administrative Code of the City of New York

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 41 of 91

40

170.    The Health Commissioner also cites the Administrative Code of the City of New York:
"Section 17-104 of the Administrative Code of the City of New York directs the
Department to adopt prompt and effective measures to prevent the communication of
infectious diseases such as COVID-19, and in accordance with Section 17-109(b), the
Department may adopt vaccination measures to effectively prevent the spread of
communicable diseases".  (**EXHIBIT 1**.)

171.    Section 17-104 authorizes quarantine measures.  NYC Admin. Code § 17-104.  If it is
the Health Commissioner's position that he is issuing a quarantine order, he has done so in
violation of the applicable law.

172.    NYC Administrative Code 17-104 (a) (2) authorizes the Health Department: "To forbid
all communication with the house or family infected with any communicable disease except
by means of physicians, nurses or messengers to carry the necessary advice, medicines and
provisions to the afflicted."

173.    10 NYCRR 2.25 (1) (d) defines "Isolation": "Isolation shall consist of the separation
from other persons, in such places, under such conditions, and for such time, as will prevent
transmission of the infectious agent, of persons known to be ill or suspected of being
infected."

174.    "Passing to the question of what power is vested in the commissioner by virtue of his
office, under the Public Health Law, it is very clear that an 'isolation of all persons and
things' is only permitted when they are 'infected with or exposed to' contagious and
infectious diseases. That that language means, when speaking of persons and things
"exposed" to disease, the actual fact and not a mere possibility, is plain from the language
which precedes it in the section." *In re Smith*, 146 N.Y. 68, 77, 40 N.E. 497, 499 (1895).

40

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO: 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 42 of 91    RECEIVED NYSCEF: 12/06/2021

41

175.    The venerable *Smith* case, involving smallpox, has never been overruled, and the limit

on the Health Commissioner's authority was reiterated by the Court of Appeals in *Crayton*

*v. Larabee*, 220 N.Y. 493; "The general authority to the health officer to absolutely

quarantine in cases of the designated diseases 'wherever he deems necessary' was not

intended to and does not confer upon him unlimited power and right to control persons and

property at his discretion."

176.    "It shall be the duty of the attending physician immediately upon discovering a case of

highly communicable disease (as defined in section 2.1 of this Part) to cause the patient to

be isolated, pending official action by the health officer." 10 NYCRR 2.27.

177.    Insofar as the Health Commissioner is citing his authority under § 17-104 (a) (2),

Petitioner notes that there is no legal authority for ordering the isolation of persons based on

their vaccination status.

178.    Section 17-109 (b) states that, "The department may take measures, and supply agents

and offer inducements and facilities for general and ***gratuitous*** vaccination, disinfection,

and for the use of diphtheria antitoxin and other vaccines and antitoxins." (***Emphasis***

***added***.) NYC Admin. Code § 17-109 (b).

179.    "Gratuitous" can mean "without cause or justification", or it can mean "free of charge".

"Gratuitous" does not mean or imply "mandatory."

180.    The citation by the Health Commissioner of his authority to provide gratuitous

vaccinations under § 17-109 (b), as support for his authority to mandate vaccination for all

City employees is misplaced.

181.    The Health Commissioner's citation of multiple sources which do not authorize the

Health Commissioner to require the vaccination of adults, is no substitute for a single

authority that actually does authorize him to do so.

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 43 of 91

182.    In fact, the failure of the Health Commissioner to cite any law, code, or regulation that actually authorizes the Vaccination Orders, despite the Smörgåsbord of law he offers, is strong evidence that none exists.

### IV.    THE VACCINATION ORDERS VIOLATE PETITIONER'S CIVIL RIGHTS (42 USC § 1983, Substantive Due Process)

183.    Petitioner was infected with COVID in March of 2020, and tested positive for COVID on March 27, 2020.  (**EXHIBIT 5**.)

184.    On August 19, 2021, Petitioner underwent Venipuncture (blood test) and was found to possess the antibodies against COVID.  (**EXHIBIT 6**.)  Accordingly, Petitioner has naturally acquired immunity to COVID, as confirmed by multiple studies.[10]

185.    The Vaccination Orders would expose Petitioner to the potential risks of an experimental vaccine, while providing him little or no additional protection.  The Yale study concluded, "the net benefit is marginal on an absolute basis. COVID-recovered individuals represent a distinctly different benefit-risk calculus. Therefore, ***vaccination of COVID-recovered individuals should be subject to clinical equipoise and individual preference***."[11] (***Emphasis added***.)

186.    The FAQ on New York City Employees Vaccine Mandate (**EXHIBIT 11.**) indicates that reasonable accommodation will only be authorized for certain limited medical reasons, which do not include the natural immunity acquired by COVID recovered individuals.

---

[10] *See* https://brownstone.org/articles/79-research-studies-affirm-naturally-acquired-immunity-to-covid-19-documented-linked-and-quoted/ (listing over 100 studies demonstrating strength of naturally acquired immunity compared to vaccine acquired immunity).
[11] "Equivalency of Protection from Natural Immunity in COVID-19 Recovered Versus Fully Vaccinated Persons: A Systematic Review and Pooled Analysis", Mahesh B. Shenai, Ralph Rahme, Hooman Noorchashm https://doi.org/10.1101/2021.09.12.21263461

187.    The right to bodily integrity, which includes the right to make one's own health care decisions, is not only guaranteed under the substantive due process of the Fourteenth Amendment, but has been recognized as a natural right pre-dating the Constitution.  "'[N]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 11 S. Ct. 1000 (1891)." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269, 110 S. Ct. 2841, 2846 (1990).

188.    "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, ***and the right to bodily integrity***. See, e.g., *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847-849, 120 L. Ed. 2d 674, 112 S. Ct. 2791 (1992) (describing cases in which substantive due process rights have been recognized)." (***Emphasis added***.)  *Albright v. Oliver*, 510 U.S. 266, 272, 114 S. Ct. 807, 812 (1994).

189.    "[A]s this Court's cases make clear, involuntary medical treatment raises questions of clear constitutional importance." *Sell v. United States*, 539 U.S. 166, 176, 123 S. Ct. 2174, 2182 (2003).

190.    Executive Order 78 referenced in the Vaccination Order was an effective, less intrusive means of achieving the same protection, to wit, City employees were required to provide "proof of full vaccination by September 13, 2021", or "on a weekly basis thereafter until the employee submits proof of full vaccination, provide the City agency or office where they work with proof of a negative COVID-19 PCR diagnostic test".  ("EO 78", **EXHIBIT 12**.)

191.    Petitioner has been complying with this Order, and continues to do so.

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 45 of 91

192.    The Vaccination Order is unsupported by a finding that EO 78 issued by Respondent de Blasio on August 31, 2021, was inadequate.

193.    Since EO 78 was implemented, there have been no changes in circumstances that would require the City to abandon this policy and impose a blanket vaccination mandate.  The Health Commissioner has identified no data that would suggest City employees have become a more significant source of transmission than they were one month ago, or that they pose more of a threat than the public at large, who are not even subjected to weekly testing.

194.    In reaffirming the Stay of the OSHA vaccination mandate, the Fifth Circuit observed, "Because it is generally "arbitrary or capricious" to "depart from a prior policy *sub silentio*," agencies must typically provide a "detailed explanation" for contradicting a prior policy…"  *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, 2021 U.S. App. LEXIS 33698, p. 12 (5th Cir. Nov. 12, 2021.)

195.    Respondents have provided no such explanation.


### V.    THE VACCINATION ORDERS VIOLATE PETITIONER'S CIVIL RIGHTS
### (42 USC § 1983, Procedural Due Process – Deprivation of Liberty)

196.    The Respondents' claim that the Health Commissioner is exercising authority vested in him by § 17-104 of the Administrative Code of the City of New York, which authorizes the Health Commissioner to quarantine, or isolate infected individuals.

197.    Pub. Health Law § 2120 provides detailed procedures for the commitment of a person with a "communicable disease who 'is unable or unwilling to conduct himself… in such a manner as not to expose… other persons.'"

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1.21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 46 of 91   RECEIVED NYSCEF: 12/06/2021

45

198.    Pub. Health Law § 2120 requires procedural due process before a person is confined, including filing "a complaint against such person with a magistrate" (§ 2120 [2]), and "due notice and a hearing" (§ 2120 [3]) *prior* to commitment.

199.    The standard in a hearing under PHL § 2120 is "clear and convincing evidence." *Bradley v. Crowell*, 181 Misc. 2d 529, 530, 694 N.Y.S.2d 617, 618 (Sup. Ct. 1999).

200.    In holding that the heightened standard of clear and convincing evidence is applicable to the hearing, the *Bradley* Court cited the Court of Appeals for "the applicability of the standard in civil cases when the 'denial of personal or liberty rights' is at issue (see, *Matter of Capoccia*, 59 NY2d 549, 553 [1983]) or when 'particularly important personal interests are at stake' (*Matter of Storar*, 52 NY2d 363, 379 [1981], cert denied 454 US 858 [1981])." *Id*. at 618.

201.    Pub. Health Law § 2124 specifically recognizes the right of a committed patient to appeal to "any court having jurisdiction, for a review of the evidence."

202.    In anticipation of Respondents' argument that Petitioner is not being confined, Petitioner asks the Court to recognize three points: first, the denial of Petitioner's right to enter the premises at which he works is the denial of a personal or liberty right of the utmost importance – the right to earn a living; second, Petitioner is at least as immune to the COVID virus as vaccinated persons, and the Order prohibiting him from entering the premises at which he works bears no rational relationship to any public health goal; third, by invoking the authority of Health Department under § 17-104 of the Administrative Code, Respondents have admitted that the Vaccination Orders impose a quarantine, isolation, or confinement, but have not complied with the applicable law affording Petitioner due process.

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 47 of 91    RECEIVED NYSCEF: 12/06/2021

46

### VI.    THE VACCINATION ORDERS VIOLATE PETITIONER'S CIVIL RIGHTS
### (42 USC § 1983, Procedural Due Process – Deprivation of Property)

203.    The Fifth Amendment to the United States Constitution, applicable to the states by the

Fourteenth Amendments to the United States Constitution prohibits the states from

depriving "any person of life, liberty, or property, without due process of law."

204.    Article I, § 6 of the New York Constitution prohibits the State and local governments

from depriving any person of "life, liberty or property without due process of law."

205.    Tenured civil service employees, including Petitioner and numerous other City

employees have a property right in continued employment. *Matter of Rivera v Beekman*, 86

AD2d 1, 9, 448 N.Y.S.2d 492 (1st Dept 1982.) "[I]t is now well settled that a temporary,

nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth

Amendment. . . . The Fourteenth Amendment draws no bright lines around three-day, 10-

day or 50-day deprivations of property." *Snead v. Dep't of Soc. Servs*., 355 F. Supp. 764,

771 (S.D.N.Y. 1973).

206.    "The constitutional guarantee o**f** due process of law (US Const, 5th, 14th Amdts; NY

Const, art I, § 6) is perhaps our greatest bulwark against unlimited power of the

sovereign. Its essence is fundamental fairness." *Economico v. Pelham*, 50 N.Y.2d 120, 124-

25, 428 N.Y.S.2d 213, 215, 405 N.E.2d 694, 696 (1980).

207.    There is no vaccination requirement for eligibility to become a police officer. NYPD

police officers have a longstanding, reasonable expectation that their public employment

and positions will not be conditioned on vaccination, particularly an experimental vaccine

that has been in use for less than a year.

208.    The Vaccination Orders mandate that City employees be "excluded from the premises at

which they work", a quarantine, or isolation under Admin. Code § 17-104, without any

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 48 of 91

47

finding by a health officer, or attending physician, that the affected City employee has been

infected with, or exposed to communicable disease.

209.    The Vaccination Orders will be enforced against employees of the NYPD by suspension

without pay for being unvaccinated ("leave without pay", "requiring members of the service

to surrender firearm(s), and certain Department property, regardless of the duration of the

leave.")  (Operations Order No. 48, **EXHIBIT 7**.)

210.    This is a punishment intended to cause humiliation and financial hardship, and clearly a

disciplinary action subject to *P.G. 206* of the *NYPD Patrol Guide* – "Disciplinary Matters",

as well as Constitutional due process requirements.

211.     Nevertheless, pursuant to the Vaccination Orders and the implementing orders issued

by Respondent Police Commissioner, leave without pay will be imposed without the due

process required by the NYPD Patrol Guide, and without even the minimal due process

required by the U.S. Constitution.

212.    The arbitrary and capricious implementation of the Vaccination Orders by the

Respondent Police Commissioner is shocking in its disregard of the procedures required by

the NYPD Patrol Guide ("P.G."), for example Operations Order No. 48 (**EXHIBIT 7**)

directs unvaccinated police officers to be placed on leave without pay without regard for

due process:

> d.    Operations Order No. 48 states that "commanding officers will comply with
> *P.G. 205-21, "Leave Without Pay[],"* steps "10" through "14." (**EXHIBIT
> 7**).

> e.    Operations Order No. 48 states "For members of the service placed on leave
> without pay pursuant to past or future Mayoral Executive Orders, DOHMH
> Commissioner's Orders, or other City mandate specific to the COVID-19
> pandemic, the procedure detailed in P.G. 205-21, steps "1" through "9" is
> superseded by Administrative Bulletin entitled "Leave Without Pay -
> Supervisor Instructions" issued on October 29, 2021.

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM
INDEX NO. 160914/2021
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 12/06/2021
Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 49 of 91

48

f.   Procedure 206-05 requires written "Charge and Specifications" for disciplinary matters.

g.   Procedure 206-06 states, "*NOTE CHARGES AND SPECIFICATIONS will be served on upon a suspended member of the service expeditiously*." (*Emphasis in original*.)

h.   Procedure 206-07 (2) and (3) list grounds for suspension or modified assignment.  Failure to submit to vaccination is not on the list.

i.   Procedure 206-06 provides procedures for "Service and Disposition of Charges and Specifications".

j.   Operations Order No. 48, ¶ 3, states "This procedure will apply retroactively to members of the service who have already been placed on leave without pay pursuant to either a "Mayoral Executive Order 78 Non-Compliance Report" or a "Department of Health and Mental Hygiene (DOHMH) Order Non-Compliance Report."

213.   *P.G. 205-21* are procedures in the NYPD Patrol Guide applicable to a request for leave without pay by a member of service, not procedures for imposing leave without pay in a disciplinary matter.

214.   Pursuant to Operations Order No. 48, Respondent Police Commissioner is ordering that members of service who are not vaccinated are to be deemed to have requested leave without pay, and treated according to steps "10" through "14" of *P.G. 205-21,* but steps "1" through "9" will be disregarded.

215.   Procedure 206-06, the procedures concerning due process for disciplinary matters are to be utterly disregarded.

216.   In sum, Respondent Police Commissioner has ordered that the due process rights of members of service will be completely dispensed with, by treating unvaccinated members as having requested leave without pay, and then granting that request; and that Operations

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 50 of 91

49

Order No. 48 will be applied *ex post facto* "to members of the service who have already been placed on leave without pay".

217.    Even assuming that the Police Commissioner may arbitrarily suspend the disciplinary procedures in the P.G., and then apply new procedures *ex post facto*, the Police Commissioner may not disregard the NYC Administrative Code.

218.    NYC Administrative Code § 14-115 (b) states the following:

> Members of the force, except as elsewhere provided herein, shall be fined, reprimanded, removed, suspended or dismissed from the force only on written charges made or preferred against them, after such charges have been examined, heard and investigated by the commissioner or one of his or her deputies upon such reasonable notice to the member or members charged, and in such manner or procedure, practice, examination and investigation as such commissioner may, by rules and regulations, from time to time prescribe.

219.    "To protect officers' rights and prevent abuse, the Administrative Code outlines procedures that must be followed in connection with imposing punishment and appealing the Commissioner's determinations. Police officers, for example, can only be disciplined "on written charges … after such charges have been examined, heard and investigated by the commissioner or one of his or her deputies upon such reasonable notice to the member or members charged" (Administrative Code of City of NY § 14-115 [b]; see also, *Matter of Foley v Bratton,* 92 NY2d 781, 787)."  *Montella v. Bratton*, 93 N.Y.2d 424, 429, 691 N.Y.S.2d 372, 375, 713 N.E.2d 406, 408 (1999).

220.    Constitutional requirements of due process are, at a minimum, "notice and some opportunity to respond".  *Prue v. Hunt*, 78 N.Y.2d 364, 369, 575 N.Y.S.2d 806, 808, 581 N.E.2d 1052, 1054 (1991).

## VII.    THE PERPETUAL EMERGENCY

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 1    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 51 of 91    RECEIVED NYSCEF: 12/06/2021

50

221.    The former Governor declared the state of emergency on March 7, 2020, when the
threat of COVID was unquestionably greater than at present.

222.    The New York State Senate and Assembly granted emergency authority to the Governor
in New York State Senate Bill No. S7919, and New York State Assembly Bill No. A09953,
which expired on April § 30, 2021.  (**EXHIBIT 4**.)

223.    On March 12, 2020, the Mayor issued Emergency Executive Order 98, declaring a local
state of emergency.  Despite the announcement from Governor Andrew Cuomo that the
state of emergency would end on June 24, 2021, the Mayor has extended the state of
emergency in the City continuously since March, 12, 2020, and most recently on October
24, 2021, in EMERGENCY EXECUTIVE ORDER NO. 271, more than seventeen months
after the initial declaration.  It seems that the Mayor has found governing by decree to be
more efficient than the normal constitutional process.

224.    Rule by decree is one of the chief evils proscribed by the Constitution of the United
States of America, and was among the underlying causes of the American Revolution, and
the founding of this republic.

225.    Petitioner does not propose the precise date that the COVID "disaster" or "emergency"
ended, but does suggest that, more than a year and a half after it was declared, the state of
emergency has ended.  The COVID rate is infinitesimally smaller than at the peak of the
"emergency" and medical experts are predicting that COVID-19 is "here to stay".[12]   The

---

[12] "I think this virus is here to stay with us and it will evolve like influenza pandemic viruses, it will evolve to become one of the other viruses that affects us," Dr. Mike Ryan, executive director of the World Health Organization's Health Emergencies Program, said at a press briefing. "WHO says Covid will mutate like the flu and is likely here to stay", CNBC, Sep 7 20211.  https://www.cnbc.com/2021/09/07/who-says-covid-is-here-to-stay-as-hopes-for-eradicating-the-virus-diminish.html

threat of COVID cannot be permitted to preempt Constitutional procedures and fundamental civil liberties forever.

226.    The abandonment of democratic government seldom occurs in times of peace and prosperity, but is eroded in times of perceived danger.  "[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 635-36 (2d Cir. 2020.)

227.    The Decree of the Reich President for the Protection of the People and the State, commonly known as the Reichstag Fire Decree, was issued in response to the fire that destroyed the historic Reichstag building which housed the German parliament, to combat acts of terrorism by Communists, which could not be "made dependent on judicial considerations." - Chancellor Adolph Hitler.

228.    The Reichstag Fire Decree was not issued by Chancellor Hitler, *after* taking absolute power over the German Government.  The Decree was signed into law by democratically elected President von Hindenburg.  The Decree provided the "legal" basis for the suspension of individual civil rights, and ultimately the foundation for the German police state of the 1930's and 40's.

229.    Closer to home, Executive Order 9066 was issued by President Franklin D. Roosevelt on February 19, 1942, a leader whose commitment to democracy is beyond question.  This emergency measure authorized the internment of approximately 120,000 American citizens of Japanese ancestry in concentration camps, based entirely on their ethnic origin.

230.    Respondents are not faced with the threat posed by the second World War.

231.    Nevertheless, the State of New York, has already started down a slippery slope.

232.    In 2021, the opportunity to ballot was cancelled for the June primary (see Assembly bill A.4447).  "*My concern is that democracy may be just the latest victim of the COVID*

*crisis,"* said Assemblyman Andrew Goodell, R-Jamestown, on the legislature floor. "*We're saying we're cancelling that opportunity for you to participate in a primary because we want to protect you from danger by cancelling your right to go to the polls to select your own candidate. It's as undemocratic as we can get and I will be opposing it."*[13]

233.    Although the Board of Health has apparently not had time to meet to consider the Health Commissioner's Vaccination Order, the Board did pass a "RESOLUTION OF THE NYC BOARD OF HEALTH DECLARING RACISM A PUBLIC HEALTH CRISIS" on October 18, 2021.  Petitioner is not suggesting that racism is not a proper concern of elected government representatives, but it is beyond the mandate of the appointed Board of Health.

234.    On July 6, 2021, within weeks of announcing the end of the COVID state of emergency, disgraced former Governor Andrew Cuomo issued Executive Order No. 211: "Declaration of a State Wide Disaster Emergency Due to Gun Violence".  The Governor's response to the increase in gun violence that occurred after the Governor signed criminal justice reform into law, was no doubt a prelude to the enactment of gun control law by executive decree that went beyond the legislation passed by the Senate and Assembly - legislation the Governor described as the "toughest gun control law in the United States of America".

## FIRST CLAIM FOR RELIEF / CAUSE OF ACTION
### (Separation of Powers)

235.    The Vaccination Orders of the Health Commissioner are *ultra vires*.

236.    There Vaccination Orders issued by the Health Commissioner, a mayoral appointee entrusted with the administration of the Department of Health, are not authorized by the

---

[13] Whitaker, John. "No 'Opportunity To Ballot' In Local Elections This Year", *The Post-Journal*, Feb. 16, 2021. https://www.post-journal.com/news/page-one/2021/02/no-opportunity-to-ballot-in-local-elections-this-year/

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 54 of 91

Public Health Law, the Executive Law, the New York City Charter, the New York City

Admirative Code, or the Health Code.

237.    There has been no delegation of authority by the New York State Legislature or by the

New York City Council to the executive branch of government to require the vaccination of

any adult, other than the limited delegation of authority by Public Health Law § 2165 to

require certain immunizations for post-secondary students.

238.    The Vaccination Orders by the Health Commissioner mandating the vaccination of

certain adults and not others involve the evaluation of political, economic, and social

concerns, which is a nondelegable legislative function.  *Boreali v. Axelrod*, 71 N.Y.2d 1, 12,

523 N.Y.S.2d 464, 470, 517 N.E.2d 1350, 1355 (1987).

239.    The mandatory vaccination of certain adults has been specifically reserved by the New

York State Legislature in Public Health Law § 206 (1) (l).

240.    The Vaccination Orders violate Article III, Section 1, of the New York State

Constitution, New York Executive Law § 24, New York Public Health Law §§ 206 (1) (l),

2164 (8), 2165 (8), 2120, the New York City Charter §§ 550, et. seq., and the New York

City Administrative Code § 17-104.

## SECOND CLAIM FOR RELIEF / CAUSE OF ACTION
### (Preemption)

241.    The Vaccination Orders of the Health Commissioner are preempted by the New York

State Public Health Law.

242.    The New York State Legislature has not delegated the authority to City of New York,

nor to any local board, body, or exeutive to require the vaccination of any adult, other than

the limited delegation of authority by Public Health Law § 2165 to require certain

immunizations for post-secondary students.

53

Case 1:21-cv-10752-JSR-BCM Document 5-1 Filed 12/16/21 Page 55 of 91

54

243.     The mandatory vaccination of adults has been specifically reserved by the New York

State Legislature in Public Health Law § 206 (1) (l).

244.     The Vaccination Orders issued by the New York City Health Commissioner are in direct

conflict with the State statutes, Public Health Law §§ 206 (1) (l), 2164, 2165, and must

yield to the State Law.

## THIRD CLAIM FOR RELIEF / CAUSE OF ACTION
### (42 USC §1983, Substantive Due Process)

245.     The Vaccination Orders violate the Petitioner's right to substantive due process

guaranteed by the Fifth Amendment to the United Stated Constitution and applicable to the

States by the Fourteenth Amendment.

246.     The Respondents, acting under color of state law have subjected the Petitioner to the

deprivation of his right to substantive due process by violating his right to bodily integrity.

247.     The right to bodily integrity, which includes the right to make one's own health care

decisions, is guaranteed under the substantive due process of the Fourteenth Amendment.

248.     The departure from less intrusive means, which had been in place and were effective, in

favor of the more intrusive Vaccine Mandates is arbitrary or capricious.

249.      Petitioner's choice between the deprivation of his substantive due process right to

bodily integrity, and the deprivation of his property right in continued civil service

employment is not a choice the Respondents have the authority to force upon him.

## FOURTH CLAIM FOR RELIEF / CAUSE OF ACTION
### (42 USC §1983, Procedural Due Process)

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 56 of 91

250.   The Vaccination Orders violate the Petitioner's right to procedural due process guaranteed by the Fifth Amendment to the United Stated Constitution and applicable to the States by the Fourteenth Amendment.

251.   The Vaccination Orders and the implementation of those Orders by the Police Commissioner violate the Petitioner's right to procedural due process under New York State Court of Appeals precedent (*Prue v. Hunt*, 78 N.Y.2d 364), the NYC Administrative Code § 14-115 (b), and wriiten NYPD Procedures (P.G. 206 – Disciplinary Matters).

252.   The Vaccination Orders authorize Respondents, acting under color of state law, to subject the Petitioner to the deprivation of his right to due process by excluding him from the premises at which he works, a deprivation of Petitioner's property right to continued employment, without any finding of wrongdoing, or even proffering charges.

253.   The enforcement of the Vaccination Orders against police officers of the NYPD by suspension ("leave without pay"), is a punishment intended to cause humiliation and financial hardship, and clearly a disciplinary action subject to the procedural due process requirements of Section 206 of the NYPD Patrol Guide as well as applicable statutory, and Constitutional due process requirements.

## **RLEIEF REQUESTED**

WHEREFORE, for the above stated reasons, Petitioner/Plaintiff, respectfully request that this Court enter a Decision, Order, and Judgment against the Respondents/Defendants as follows:

(a)   On the **First Claim for Relief/Cause of Action**, that Respondents/Defendants are permanently restrained and enjoined from enforcing the Vaccination Orders, and a Declaratory Judgment that the Vaccination Orders are null and void as being *ultra vires*, in excess of the

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 57 of 91

Health Commissioners authority; unauthorized by any delegation of authority by the State
Legislature or the City Council; violate Article III, Section 1, of the Constitution of the State of
New York; violate NY City Charter § 21; and violate New York State Law including the New
York Public Health Law; and,

(b)     On the **Second Claim for Relief/Cause of Action**, that Respondents/Defendants
are permanently restrained and enjoined from enforcing the Vaccination Orders, and a
Declaratory Judgment that the Vaccination Orders are null and void as being preempted by New
York State Public Health Law §§ 206 (1) (l), 2164 (8), 2165 (8), 2120 (3); and the NYC
Administrative Code 17-104, and 17-109; and *ultra vires* as being in excess of any authority
delegated by the State of New York to the City of New York, the City Council, the Mayor, the
New York City Department of Health and Mental Hygiene, the Health Commissioner, or the
New York City Board of Health; and,

(c)     On the **Third Claim for Relief/Cause of Action**, that Respondents/Defendants
are permanently restrained and enjoined from enforcing the Vaccination Orders, and a
Declaratory Judgment that the Vaccination Orders are null and void as violating Petitioner's and
other City employees' substantive due process rights guaranteed by the Fifth Amendment to the
United States Constitution and applicable to the states by the Fourteenth Amendment,
specifically Petitioner's right to bodily integrity including his right to make his own health care
decisions; and,

(d)     On the **Fourth Claim for Relief/Cause of Action**, that Respondents/Defendants
are permanently restrained and enjoined from enforcing the Vaccination Orders, and any other
Orders, Rules, Regulations, Procedures, or directives of any kind implementing said Vaccination
Orders, and a Declaratory Judgment that the Vaccination Orders and the Orders of the Police

Commissioner are null and void as violating Petitioner's and other City employees' right to procedural due process guaranteed by the Fifth Amendment to the United States Constitution and applicable to the states by the Fourteenth Amendment, and specifically violating Petitioner's and other City employees rights to due process under the Constitution of the State of New York, the Law of the State of New York, the New York City Charter, the New York City Administrative Code, the Procedures of the NYPD.

(e)     Granting Petitioners/Plaintiffs costs and reasonable attorney's fees pursuant to 42 USC § 1988 (b); and,

(f)     Granting Petitioners/Plaintiffs such other and further relief as this Court deems just and proper;

DATED:   Nanuet, New York
         November 29, 2021.

                              PATRICIA FINN ATTORNEY, P.C.
                              *Attorneys for Petitioner*

                              *s/Patricia Finn, Esq.*

                              *Patricia Finn*
                              _____
                              Patricia Finn, Esq. (Bar No. 4109997)

.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------------x

NYPD DETECTIVE # 1, and all other individuals similarly situated,

                Plaintiff\Petitioner

      -against-

BILL DE BLASIO, MAYOR OF THE CITY OF NEW YORK,
in his official capacity; DAVE A. CHOCKSHI,
COMMISSIONER OF HEALTH AND MENTAL HYGIENE,
in his official capacity; DERMOT SHEA, POLICE
COMMISSIONER, in his official capacity; and THE CITY OF
NEW YORK.

               Defendants\Respondents

-------------------------------------------------------------------------------x

**VERIFICATION OF
ARTICLE 78 PETITION
AND COMPLAINT**

STATE OF NEW YORK    )
                        )
COUNTY OF _Nassau_  )

    I, ANTHONY MARCIANO, Petitioner\Plaintiff, being duly sworn, deposes and says: I
submit the attached Verified Article 78 Petition\Complaint, and know the contents thereof; that
the same is true to the knowledge of deponent except as to the matters therein stated to be alleged
upon information and belief, and as to those matters, I believe them to be true.

Anthony Marciano, *petitioner/plaintiff*

Sworn to before me this 30 day of
November 2021.

Notary Public

MELISSA CAMPAGNOLI
Notary Public - State of New York
NO. 01CA6308154
Qualified in Nassau County
My Commission Expires Jul 21, 2022

### ORDER OF THE COMMISSIONER
### OF HEALTH AND MENTAL HYGIENE
### TO REQUIRE COVID-19 VACCINATION FOR
### CITY EMPLOYEES AND CERTAIN CITY CONTRACTORS

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends; and

**WHEREAS**, pursuant to Section 556 of the Charter and Section 3.01(c) of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control and Prevention ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and the development of new variants, and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS,** the Department reports that between January 17 and August 7, 2021, people who were unvaccinated or not fully vaccinated accounted for 96.1% of COVID-19 cases, 96.9% of COVID-19 hospitalizations, and 97.3% of COVID-19 deaths in New York City; and

**WHEREAS,** a study by Yale University demonstrated that the Department's vaccination campaign was estimated to have prevented about 250,000 COVID-19 cases, 44,000 hospitalizations, and 8,300 deaths from COVID-19 infection since the start of vaccination through July 1, 2021, and by information and belief, the number of prevented cases, hospitalizations, and death has risen since then; and

**WHEREAS,** on August 16, 2021, Mayor de Blasio issued Emergency Executive Order No. 225, the "Key to NYC," requiring that patrons and employees of establishments providing indoor entertainment, dining, and gyms and fitness centers must show proof that they have received at least one dose of an approved COVID-19 vaccine, and such Order, as amended, is still in effect; and

**WHEREAS,** on August 24, 2021, I issued an Order requiring that Department of Education employees, contractors, and visitors provide proof of COVID-19 vaccination before entering a DOE building or school setting, and such Order was re-issued on September 12 and

15, 2021, and subsequently amended on September 28, 2021, and such Orders and amendment were ratified by the New York City Board of Health on September 17, 2021 and October 18, 2021; and

**WHEREAS**, on August 26, 2021, the New York State Department of Health adopted emergency regulations requiring staff of inpatient hospitals and nursing homes to receive the first dose of a COVID-19 vaccine by September 27, 2021, and staff of diagnostic and treatment centers, hospices, home care and adult care facilities to receive the first dose of a COVID-19 vaccine by October 7, 2021; and

**WHEREAS,** on August 31, 2021, Mayor de Blasio issued Executive Order No. 78, requiring that, beginning September 13, 2021, City employees and covered employees of City contractors be vaccinated against COVID-19 or submit on a weekly basis proof of a negative COVID-19 PCR diagnostic test; and

**WHEREAS,** on September 9, 2021 President Biden issued an Executive Order stating that "It is essential that Federal employees take all available steps to protect themselves and avoid spreading COVID-19 to their co-workers and members of the public," and ordering each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its Federal employees, with exceptions only as required by law"; and

**WHEREAS,** on September 12, 2021, I issued an Order requiring that staff of early childhood programs or services provided under contract with the Department of Education or the Department of Youth and Community Development provide proof of COVID-19 vaccination; and

**WHEREAS,** Section 17-104 of the Administrative Code of the City of New York directs the Department to adopt prompt and effective measures to prevent the communication of infectious diseases such as COVID-19, and in accordance with Section 17-109(b), the Department may adopt vaccination measures to effectively prevent the spread of communicable diseases; and

**WHEREAS,** City employees and City contractors provide services to all New Yorkers that are critical to the health, safety, and well-being of City residents, and the City should take reasonable measures to reduce the transmission of COVID-19 when providing such services; and

**WHEREAS**, a system of vaccination for individuals providing City services and working in City offices will potentially save lives, protect public health, and promote public safety; and

**WHEREAS,** there is a staff shortage at Department of Corrections ("DOC") facilities, and in consideration of potential effects on the health and safety of inmates in such facilities, and of the benefit to public health and employee health of a fully vaccinated correctional staff, it is necessary that the requirements of this Order for DOC uniformed personnel not assigned to posts in healthcare settings be delayed; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such Section;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 62 of 91

**EXHIBIT 1**

necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, and order that:

1. My Order of August 10, 2021, relating to a vaccination or testing requirement for staff in City operated or contracted residential and congregate settings, shall be **RESCINDED** as of November 1, 2021. Such staff are subject to the requirements of this Order.

2. No later than 5pm on October 29, 2021, all City employees, except those employees described in Paragraph 5, must provide proof to the agency or office where they work that:

   a. they have been fully vaccinated against COVID-19; or
   b. they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or
   c. they have received the first dose of a two-dose COVID-19 vaccine

   Any employee who received only the first dose of a two-dose vaccine at the time they provided the proof described in this Paragraph shall, within 45 days after receipt of the first dose, provide proof that they have received the second dose of vaccine.

3. Any City employee who has not provided the proof described in Paragraph 2 must be excluded from the premises at which they work beginning on November 1, 2021.

4. No later than 5pm on October 29, 2021, City agencies that contract for human services contracts must take all necessary actions to require that those human services contractors require their covered employees to provide proof that:

   a. they have been fully vaccinated against COVID-19; or
   b. they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or
   c. they have received the first dose of a two-dose COVID-19 vaccine.

   Any covered employee of a human service contractor who received only the first dose of a two-dose vaccine at the time they provided the proof described in this Paragraph shall, within 45 days after receipt of the first dose, provide proof that they have received the second dose of vaccine.

   All such contractors shall submit a certification to their contracting agency confirming that they are requiring their covered employees to provide such proof. If contractors are non-compliant, the contracting City agencies may exercise any rights they may have under their contract.

5. Notwithstanding Paragraphs 3 and 4 of this Order, until November 30, 2021, the provisions of this Order shall not apply to uniformed Department of Corrections ("DOC") employees, including staff serving in Warden and Chief titles, unless such uniformed employee is assigned for any time to any of the following locations: Bellevue Hospital; Elmhurst Hospital; the DOC

infirmary in North Infirmary Command; the DOC West Facility; or any clinic staffed by Correctional Health Services.

Uniformed employees not assigned to such locations, to whom this Order does not apply until November 30, 2021, must, until such date, either:

    a. Provide DOC with proof that:
        i. they have been fully vaccinated against COVID-19; or
        ii. they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or
        iii. they have received the first dose of a two-dose COVID-19 vaccine, provided that they must additionally provide proof that they have received the second dose of vaccine within 45 days after receipt of the first dose; or

    b. On a weekly basis until the employee submits the proof described in this Paragraph, provide DOC with proof of a negative COVID-19 PCR diagnostic test (not an antibody test).

6. For the purposes of this Order:

"City employee" means a full- or part-time employee, intern, or volunteer of a New York City agency.

"Contract" means a contract awarded by the City, and any subcontract under such a contract, for work: (i) to be performed within the City of New York; and (ii) where employees can be expected to physically interact with City employees or members of the public in the course of performing work under the contract.

"Contractor" means a person or entity that has a City contract, including a subcontract as described in the definition of "contract."

"Covered employee" means a person: (i) employed by a contractor or subcontractor holding a contract; (ii) whose salary is paid in whole or in part from funds provided under a City contract; and (iii) who performs any part of the work under the contract within the City of New York. However, a person whose work under the contract does not include physical interaction with City employees or members of the public shall not be deemed to be a covered employee.

"Fully vaccinated" means at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a two-dose series of a COVID-19 vaccine as approved or authorized for use by the Food and Drug Administration or World Health Organization.

"Human services contract" means social services contracted by an agency on behalf of third-party clients including but not limited to day care, foster care, home care, health or medical services, housing and shelter assistance, preventive services, youth services, the operation of



senior centers, employment training and assistance, vocational and educational programs, legal services and recreation programs.

7. Each City agency shall send each of its human services contractors notice that covered employees of such contractors must comply with the requirement of Paragraph 4 of this Order and request a response from each such contractor, as soon as possible, with regard to the contractor's intent to follow this Order.

8. Nothing in this Order shall be construed to prohibit any reasonable accommodation otherwise required by law.

9. This Order shall not apply to individuals who already are subject to another Order of the Commissioner of Health and Mental Hygiene, Board of Health, the Mayor, or a State or federal entity that requires them to provide proof of full vaccination and have been granted a reasonable accommodation to such requirement.

10. This Order shall not apply to per diem poll workers hired by the New York City Board of Elections to conduct the election scheduled for November 2, 2021.

11. Subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code, this Order shall be effective immediately and remain in effect until rescinded, except that Paragraph 5 of this Order will be deemed repealed on December 1, 2021.

Dated: October 20, 2021

_____
Dave A. Chokshi, M.D., MSc
Commissioner

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 65 of 91

**EXHIBIT 2**

# SUPPLEMENTAL ORDER
## OF THE COMMISSIONER OF HEALTH AND MENTAL HYGIENE
## TO REQUIRE COVID-19 VACCINATION FOR CITY EMPLOYEES AND
## EMPLOYEES OF CERTAIN CITY CONTRACTORS

**WHEREAS,** on October 20, 2021, I issued an Order requiring city employees and human services contractors of city agencies provide proof of COVID-19 vaccination no later than October 29, 2021; and

**WHEREAS,** it is necessary that the requirements of that Order be extended to include all contractors working at locations where human services are provided and all employees of contractors who regularly work alongside City employees at locations controlled by the City of New York; and

**WHEREAS,** to ensure an orderly election, the requirements of that Order for employees of the Board of Elections must be delayed; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such Section;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, and order that:

1. The requirements of my Order of October 20, 2021, relating to a vaccination requirement for City employees and human services contractors of City agencies, are continued and incorporated herein.

2. City agencies must take all necessary actions to require that their contractors (not covered by my Order of October 20, 2021) ensure their covered employees who provide services in locations where human services are provided and covered employees of any other contractors whose work responsibilities require them to regularly work alongside City employees at a location controlled by the City of New York, provide proof no later than 5pm on November 8, 2021, that:

   a. they have been fully vaccinated against COVID-19; or
   b. they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or
   c. they have received the first dose of a two-dose COVID-19 vaccine.

   Any covered employee of such a contractor who received only the first dose of a two-dose vaccine at the time they provided the proof described in this Paragraph shall, within 45 days after receipt of the first dose, provide proof that they have received the second dose of vaccine.

All such contractors shall submit a certification to their contracting agency confirming that they are requiring their covered employees to provide such proof. If contractors are non-compliant, the contracting City agencies may exercise any rights they may have under their contract.

3. Notwithstanding Paragraph 2 of this Order and Paragraph 3 of my Order of October 20, 2021, the vaccination requirements of such Orders shall not apply to any Board of Elections ("BOE") employee or any contractor of the BOE until 5pm on November 30, 2021.

Until November 30, 2021, BOE employees must provide to BOE, and BOE must take any necessary action to require its contractors to require that their covered employees provide to their employer, either:

    a. Proof that:
        i. they have been fully vaccinated against COVID-19; or
        ii. they have received a single-dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or
        iii. they have received the first dose of a two-dose COVID-19 vaccine, provided that they must additionally provide proof that they have received the second dose of vaccine within 45 days after receipt of the first dose; or

    b. On a weekly basis until the employee submits the proof described in this Paragraph, proof of a negative COVID-19 PCR diagnostic test (not an antibody test).

4. For the purposes of this Order:

"City employee" means a full- or part-time employee, intern, or volunteer of a New York City agency.

"Contract" means a contract awarded by the City, and any subcontract under such a contract, for work: (i) to be performed within the City of New York; and (ii) where employees can be expected to physically interact with City employees or members of the public in the course of performing work under the contract. "Contractor" means a person or entity that has a City contract, including a subcontract as described in the definition of "contract."

"Covered employee" means a person: (i) employed by a contractor or subcontractor holding a contract or subcontract; (ii) whose salary is paid in whole or in part from funds provided under a City contract; and (iii) who performs any part of the work under the contract within the City of New York. However, a person whose work under the contract does not include physical interaction with City employees or members of the public shall not be deemed to be a covered employee.

"Fully vaccinated" means at least two weeks have passed after an individual received a single dose of a COVID-19 vaccine that only requires one dose, or the second dose of a

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM

NYSCEF DOC. NO. 6

INDEX NO. 160914/2021

RECEIVED NYSCEF: 12/01/2021

Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    Page 67 of 91

EXHIBIT 2

two-dose series of a COVID-19 vaccine as approved or authorized for use by the Food and Drug Administration or World Health Organization.

"Human services contract" means social services contracted by an agency on behalf of third-party clients including but not limited to day care, foster care, home care, health or medical services, housing and shelter assistance, preventive services, youth services, the operation of senior centers, employment training and assistance, vocational and educational programs, legal services and recreation programs.

5. Each City agency shall send each of its contractors to whom Paragraph 2 of this Order applies, notice that such covered employees must comply with the requirement of Paragraph 2 of this Order and request a response from each such contractor, as soon as possible, with regard to the contractor's intent to follow this Order.

6. Nothing in this Order shall be construed to prohibit any reasonable accommodation otherwise required by law.

7. Subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code, this Order shall be effective immediately and remain in effect until rescinded.

Dated: October 31, 2021

Dave A. Chokshi, M.D., MSc
Commissioner

**EXHIBIT 3**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND**
------------------------------------------------------------------------X   **IAS PART 21**

**INDEPENDENT RESTAURANT OWNERS**
**ASSOCIATION RESCUE (I.R.O.A.R.),**          **Present:**
**EVOLVE33LLC d/b/a EVOLVE-33,**
**STATEN ISLAND JUDO JUJITSU,**               **Hon. Lizette Colon, J.S.C.**
**DELUCA'S ITALIA RESTAURANT, INC.,**
**PROJECT VISUAL, INC. d/b/a MAX'S ESCA, and**   **DECISION AND ORDER**
**ROCCO'S BROOKLYN BAKERA d/b/a**
**PASTICCERIA ROCCO,**                        **Index No. 85155/2021**

                                  **Petitioners,**   **Motion No. 001 & 002**

     **-against-**

**BILL DE BLASIO, in his official capacity as**
**MAYOR of the City of New York, and**
**THE CITY OF NEW YORK,**

                          **Respondents.**

------------------------------------------------------------------------X
The following papers numbered 1 to 4 were marked fully submitted on September 3, 2021:

|  | Papers Numbered |
|---|---|
| Order to Show Cause annexing a Verified Petition dated August 17, 2021 ......... | 1 |
| Respondent's Affirmation in Opposition prepared by Jay Varma, M.D. dated September 2, 2021, with Exhibits Annexed ............................................. | 2 |
| Respondent's Memorandum of Law in Opposition ..................................... | 3 |
| Notice of Petition ........................................................................ | 4 |

Petitioners seek an order from this Court permanently enjoining the enforcement of the
"regulation" promulgated by the government requiring any entity that operates one or more
covered premises [Indoor Entertainment and Recreational Settings, Indoor Food Services, and
Indoor Gyms and Fitness Settings] from allowing specified individuals from entering their covered
premises without providing "proof of vaccination and identification bearing the same identifying

**EXHIBIT 3**

information as the proof of vaccination" or face a significant fine beginning on September 13, 2021. The Court denies petitioners' application without prejudice.

*What is the Article 78 proceeding and when should it be used?*

Professor Siegel in his treatise *New York Practice* summarizes the use of the Article 78 proceeding succinctly when he said:

> The Article 78 proceeding supersedes the common law writs of mandamus, prohibition and certiorari to review, supplying in replacement of all three of them a uniform device for challenging the **activities of an administrative agency in court**. The administrative agency is the major apparatus today for the conduct of government, the unit through which regulation reaches down to the people on an individual basis (New York Practice, Siegel and Connors 6th ed. § 557)(emphasis added).

Without belaboring the point, the people may utilize the Article 78 proceeding to check the government's use of its administrative powers through various agencies before a court. Despite the arguments raised by petitioners and the responses provided by the government's lawyers Mayor Bill de Blasio is not an administrative agency, nor are the executive orders he issues administrative regulations contemplated under Article 78. And while petitioners failed to annex a copy of Emergency Executive Order No. 225, or any other admissible evidence supporting their arguments, to their moving papers, requirements made clear by statutory law, regulatory rules, and the terms of New York City's charter provided for its widespread dissemination to the public— including this Court.

*What is an Executive Order and what is its function?*

The New York City Charter, like the constitutions governing the actions of the federal and state governments separates governmental powers across three branches of government—the Executive, Legislative, and Judicial. In this context petitioners tried to challenge actions taken by the Executive branch—the mayor. The Executive branch of government may issue directives to

2

FILED: NEW YORK COUNTY CLERK 02/00/2021 00:32 PM INDEX NO. 160955/2021
NYSCEF DOC. NO. 13 Case 1:21-cv-10752-JSR-BCM Document 5-1 Filed 12/16/21 Page 70 of 91 RECEIVED NYSCEF: 02/00/2021

EXHIBIT 3

those entities within its authority in the form of executive orders which may have limited or widespread effect and may or may not last beyond the Executive's term in office depending on the prerogatives of the Executive's successors. Those individuals subject to the orders issued by the Executive, generally employees of the Executive branch, must obey orders issued by the Executive because those orders represent the will of the executive branch of government which resides in an individual elected by the people.

While the administration of governmental agencies operated by the Executive branch may reach down and directly affect the people on an individual basis, the government, through the Executive, *may* not usually dictate a course of conduct on the people through fiat—citizens, whether small business owners or residents of the City, are not employees of the Executive branch government.

Those individuals tasked with drafting the framework of governmental power during periods of calm reflection delineated how a civil government should exercise its authority over the people notwithstanding periods of unanticipated emergency short of martial law. Emergency Executive Order No. 225 seems to recognize this reality but moves a step farther when it states unequivocally the following:

> NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the **common law authority to protect the public in the event of an emergency**… (emphasis added)

This Court recognizes a State's authority encompasses those limited and enumerated powers permitting the government to protect the rights of the people—which *may* include reasonable steps to protect their health and welfare. However, this Court knows of no common

3

**EXHIBIT 3**

law power in New York State granting an individual acting in the capacity as the local Executive branch the "authority" to "protect the public in the event of an emergency."

New York State Executive Law § 24, in effect when the Mayor issued Emergency Executive Order No. 225 permits a local chief executive to issue a proclamation "not to exceed thirty days or until rescinded by the chief executive, whichever occurs first."

The relevant portion of the Executive Law provides illustrative cases of what *may* constitute instances where a "chief executive may promulgate local emergency orders to protect life and property or to bring the emergency situation under control." The statute's language indicates the executive *may* have limited authority to promulgate directives *suspending* local ordinances, regulatory rules, and state laws for a limited period. It also appears that the statute may permit the executive to *proactively* issue orders to establish medical care facilities and to provide public services through executive orders. It does not provide a basis to proactively issue so-called unlimited emergency regulations. The statute provides the following illustrations of permissible emergency actions:

> a. the establishment of a curfew and the prohibition and control of pedestrian and vehicular traffic, except essential emergency vehicles and personnel;
>
> b. the designation of specific zones within which the occupancy and use of buildings and the ingress and egress of vehicles and persons may be prohibited or regulated;
>
> c. the regulation and closing of places of amusement and assembly;
>
> d. the suspension or limitation of the sale, dispensing, use or transportation of alcoholic beverages, firearms, explosives, and flammable materials and liquids;
>
> e. the prohibition and control of the presence of persons on public streets and places;

4

**EXHIBIT 3**

f. the establishment or designation of emergency shelters, emergency medical shelters, and in consultation with the state commissioner of health, community based care centers;

g. the suspension within any part or all of its territorial limits of any of its local laws, ordinances or regulations, or parts thereof subject to federal and state constitutional, statutory and regulatory limitations, which may prevent, hinder, or delay necessary action in coping with a disaster or recovery therefrom whenever (1) a request has been made pursuant to subdivision seven of this section, or (2) whenever the governor has declared a state disaster emergency pursuant to section twenty-eight of this article. Suspension of any local law, ordinance or regulation pursuant to this paragraph shall be subject to the following standards and limits:

> (i) no suspension shall be made for a period in excess of five days, provided, however, that upon reconsideration of all the relevant facts and circumstances, a suspension may be extended for additional periods not to exceed five days each during the pendency of the state of emergency;

> (ii) no suspension shall be made which does not safeguard the health and welfare of the public and which is not reasonably necessary to the disaster effort;

> (iii) any such suspension order shall specify the local law, ordinance or regulation, or part thereof suspended and the terms and conditions of the suspension;

> (iv) the order may provide for such suspension only under particular circumstances, and may provide for the alteration or modification of the requirements of such local law, ordinance or regulation suspended, and may include other terms and conditions;

> (v) any such suspension order shall provide for the minimum deviation from the requirements of the local law, ordinance or regulation suspended consistent with the disaster action deemed necessary; and

5

**EXHIBIT 3**

> (vi) when practicable, specialists shall be assigned to assist with the related emergency actions to avoid adverse effects resulting from such suspension.

The law makes it clear that a local executive *may* declare a localized emergency under the statutory powers of the state. The New York City Administrative Code defines the instances where a mayor *may* declare a localized state of emergency within New York City. The relevant portion of the code reads in its totality:

> Whenever the mayor determines that there has been an act of violence or a flagrant and substantial defiance of or resistance to a lawful exercise of public authority, and that, partly on account thereof, there is reason to believe that there exists a clear and present danger of a riot or other general public disorder, widespread disobedience of the law, and substantial injury to persons or to property, all of which constitutes a threat to public peace or order and to the general welfare of the city or part or parts thereof, the mayor may declare that a state of emergency exists within the city or any part of parts thereof. NYC Admin Code § 3-104

If a mayor exercises the authority to proclaim a state of emergency, it becomes subject to a time limitation also proscribed by the Administrative Code. The relevant portion of the code follows in its totality:

> A state of emergency established under the code shall commence upon the declaration thereof by the mayor and shall terminate at the end of a period of five consecutive days thereafter, unless prior to the end of such five day period, the mayor shall either terminate such state of emergency or shall declare an additional state of emergency. Any such additional state of emergency shall commence and determinate as provided in section 3-140 and in this section. NYC Admin. Code § 3-107.

The current pandemic status, despite its worldwide impact, does not seem to meet the first element necessary to declare a state of emergency under the quoted language of New York City's code ("an act of violence or a flagrant and substantial defiance of or resistance of a lawful exercise

6

**EXHIBIT 3**

of public authority…").  The government seems to acknowledge this point in the language it chose

to justify the authority when it issued Emergency Executive Order No. 225:

> The restraints on the Mayor's executive authority does not prevent a government from
> issuing prescriptive remedies for a health crisis.  The government may act either through the City
> Council's passage of local ordinances and laws, or similarly through the administrative process.
> The New York City Charter and New York City Administrative Code provides agencies with
> procedures for emergency rulemaking.  Emergency procedures exist providing a framework for
> emergency rulemaking in the Administrative Code which provides:

> > i. Emergency procedures.

> > 1. Notwithstanding any other provision of this section, an agency
> > may adopt a rule prior to the notice and comment otherwise required
> > by this section if the immediate effectiveness of such rule is
> > necessary to address an imminent threat to health, safety, property
> > or a necessary service. A finding of such imminent threat and the
> > specific reasons for the finding must be made in writing by the
> > agency adopting such rule and shall be approved by the mayor
> > before such rule may be made effective. In the event that an elected
> > official other than the mayor has the authority to promulgate rules,
> > such official may make such findings without prior mayoral
> > approval. The rule and accompanying finding shall be made public
> > forthwith and shall be published in the City Record as soon as
> > practicable. Agencies shall also electronically transmit all
> > emergency rules adopted pursuant to this paragraph to the office of
> > the speaker of the council, the council's office of legislative
> > documents, the corporation counsel, each council member, the
> > chairs of all community boards, the news media and civic
> > organizations, as such term is defined in subdivision b of this
> > section, no later than the date the emergency rules are transmitted to
> > the City Record for publication pursuant to this paragraph.

> > 2. A rule adopted on an emergency basis shall not remain in effect
> > for longer than sixty days unless the agency has initiated notice and
> > comment otherwise required by this section within such sixty day
> > period and publishes with such notice a statement that an extension
> > of such rule on an emergency basis is necessary for an additional
> > sixty days to afford an opportunity for notice and comment and to

7

FILED: NEWMONR COUNTY CLERK 02/00/2021 00:32 BM
NYSCEF DOC. NO. 13

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 75 of 91

INDEX NO. 168955/2021
RECEIVED NYSCEF: 02/00/2021

EXHIBIT 3

adopt a final rule as required by this section; provided that no further such finding of an emergency may be made with respect to the same or a substantially similar rule.

NYC Admin. Code § 1041

Unlike either legislation or regulation the use of emergency executive powers by the government eliminates the people's rightful role in government. While the use of an executive order may be permitted, its use is strictly limited. The purported actions taken in Emergency Executive Order No. 225 seeking to affect the public health and welfare of the people within New York City are opaque. Still Emergency Executive Order No. 225 issued by the government dictates affirmative steps effectively deputizing private individuals to curtail the freedom of movement and association of their neighbors and patrons or face significant fines. An official record justifying the government's fiat does not exist. Public testimony from public health care scholars and practitioners supporting these steps do not exist. The people's representatives are not on record questioning the decisions, conclusions, and guidance of health care scholars and practitioners.

What does exist are 11 "whereas" clauses with one stating in particular:

> WHEREAS, a study by Yale University demonstrated that the City's vaccination campaign was estimated to have prevented about 250,000 COVID-19 cases, 44,000 hospitalizations and 8,300 deaths from COVID-19 infection since the start of vaccination through July 1, 2021, and the City believes the number of prevented cases, hospitalizations and death has risen since then; and that between January 1, 2021, and June 15, 2021, over 98% of hospitalizations and deaths from COVID-19 infection involved those who were not fully vaccinated.

Yet even this single speculative "whereas" clause fails to state with particularity the names of the authors who prepared the Yale study, when it was released, where it was published, who

FILED: NEW YORK COUNTY CLERK 02/00/2021 00:32 PM     INDEX NO. 160955/2021
NYSCEF DOC. NO. 13     Case 1:21-cv-10752-JSR-BCM     Document 5-1     Filed 12/16/21     RECEIVED NYSCEF: 02/00/2021     Page 76 of 91

**EXHIBIT 3**

funded the research that produced the study, and what informs the City's "beliefs." Government should not and must not operate in such a manner.

The government and by extension the executive derive no inherent power from the common law in New York. An executive order is neither an administrative regulation promulgated under the procedures governing the administrative law, nor is it binding law created under the governmental authority of New York's constitution or the New York City Charter. There exists no authority remotely suggesting that the Mayor of New York City may promulgate permanent administrative rules unilaterally outside the normal and emergency rulemaking process.[1] An executive order represents the prerogative of a single individual, and therefore should be limited in scope and duration—even in the context of an emergency. It therefore appears, but is not argued, that petitioners seek to challenge the improper use of local Executive power and not a regulation promulgated by a New York City administrative agency.[2] This Court lacks the authority to rule on controversies not argued by the litigants, nor is it imbued with the power to divine the intentions of the advocates before it.

*So, an Executive Order is not a law but is it a Constitutional exercise of local governmental power?*

Assuming petitioners brought the proper challenge before this Court, and provided it with evidence in admissible form, and that legislation existed mandating that the people submit to vaccination the Court *could* have ruled that the **state** has the constitutional authority to promulgate legislation mandating the vaccination of its citizens without running afoul of the United States Constitution applicable to the states through the 14th Amendment. Assuming a state law existed requiring citizens submit to vaccination and enabling localities to carry out the law, a locality may

---

[1]     Administrative agencies lack authority to issue permanent emergency regulations even while utilizing an abridged emergency rulemaking process.

[2]     Petitioners assumed during oral argument that an administrative agency issued the "regulation" it challenged.

9

EXHIBIT 3

promulgate ordinances or regulations designed to lead to compliance with the state's law requiring vaccination. In the same vein a government may then pass legislation or administrative regulations limiting freedoms within the state or locality based on a person's vaccination status. Laws or regulations based on vaccination status *may* not require analysis according to a strict scrutiny standard because they may not involve a fundamental right, protected class, or impermissible motive depending on the language of law or regulation (*Village of Willowbrook v. Olech*, 528 US 562 [2000]).

The government cites the 116-year-old decision issued by the Supreme Court of the United States decision in *Jacobson v. Massachusetts*, 197 US 11 [1905] as precedential. This case involved the actions taken by Massachusetts and the locality of Cambridge in combatting an increase of small pox within the city of Cambridge[3] (*id* at 27). Jacobson refused vaccination and received a five-dollar fine. He then challenged the constitutionality of the regulation and the law enabling the regulation's passage (*id* at 22-24).

The Supreme Court held individual rights are not absolute and may give way to necessary state action. The high court determined that

> [t]he authority of the State to enact this statute [cited at footnote 3] is to be referred to what is commonly called the police power – a power which the State did not surrender when becoming a member of the Union under the Constitution. Although this court has

---

[3]     "The Revised Law of that Commonwealth, c. 75, § 137, provide that the 'board of health of a city or town if, in its opinion, it is necessary for the public health or safety shall require and enforce the vaccination and revaccination of all the inhabitants thereof and shall provide them with the means of free vaccination. Whoever, being over twenty-one years of age and not under guardianship, refuses or neglects to comply with such requirement shall forfeit five dollars.' An exception is made in favor of 'children who present a certificate, signed by a registered physician that they are unfit subjects for vaccination.' § 139"

"Proceeding under the above statutes, the Board of Health of the city of Cambridge, Massachusetts, on the twenty-seventh day of February, 1902, adopted the following regulation: 'Whereas, smallpox has been prevalent to some extent in the city of Cambridge and still continues to increase; and whereas, it is necessary for the speedy extermination of the disease, that all persons not protected by vaccination should be vaccinated; and whereas, in the opinion of the board, the public health and safety require the vaccination or revaccination of all the inhabitants of Cambridge; be it ordered, that all the inhabitants of the city who have not been successfully vaccinated since March, 1, 1897, be vaccinated or revaccinated.'" (*Jacobson v. Massachusetts,* 1905 US LEXIS 1232, ***3-4)

10

FILED: NEWMONE COUNTY CLERK 02/00/2021 00:32 PM
NYSCEF DOC. NO. 13

INDEX NO. 168955/2021
RECEIVED NYSCEF: 02/00/2021

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 78 of 91

**EXHIBIT 3**

refrained from any attempt to define the limits of that power, yet it has distinctly recognized the authority of a State to enact quarantine laws and 'health laws of every description;' indeed, all laws that relate to matters completely within its territory and which do not by their necessary operation affect the people of other States. According to settled principles the police power of a State must be held to embrace, at least, such reasonable regulations established directly by **legislative enactment** as will protect the public health and the public safety... It is equally true that the State may invest local bodies called into existence for purposes of local administration with authority in some appropriate way to safeguard the public health and the public safety. The mode or manner in which those results are to be accomplished is within the discretion of the State subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a State, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States or infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the **acknowledged power of a State**, must always yield in case of conflict with the exercise by the General Government of any power it possesses under the Constitution, or with any right which that instrument gives or secures... (id. at 25 [emphasis added] [citations omitted]).

Unlike the situation presented to the Supreme Court of the United States in *Jacobsen* New York did not acknowledge its inherent police power in a legislative enactment requiring its citizens submit to a mandatory vaccination for COVID-19. New York provides no legislative mandate requiring people in this state to submit to a COVID-19 vaccine.

Indeed, while both petitioners and the government reference a decision from the Supreme Court of the United States evaluating COVID-19 restrictions in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 US ___ [2020] it remains unclear if its holding would control concerning the Mayor of New York City's edict contained in Emergency Executive Order No. 225.

In *Roman Catholic Diocese of Brooklyn*, the high court analyzed the substance of Executive Order 202.28 issued by Governor Cuomo on May 7, 2020. In its summary of the Governor's Executive Order the high court pointed out that the substance of the edict treated

11

FILED: NEWHMONE COUNTY CLERK 02/00/2021 00:32 PM
NYSCEF DOC. NO. 13
Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 79 of 91
INDEX NO. 160955/2021
RECEIVED NYSCEF: 02/00/2021

**EXHIBIT 3**

houses of worship differently than other activities operating in the same areas (id.)  The analysis

of the actions taken by the Governor of New York and the Mayor of New York City requires

resolving certain subtle nuances concerning the executive powers each individual holds or held.

The New York State legislature amended the New York State Executive Law in March

2020 granting the **governor** alone with additional emergency executive powers to take affirmative

steps generally seen as legislative in nature.  The since repealed statute granted the following

additional powers to the governor

> [t]he governor, by executive order, [to] issue any directive during a
> state of disaster emergency declared in the following instances: fire,
> flood, earthquake, hurricane, tornado, high water, landslide,
> mudslide, wind, storm, wave action, volcanic activity, epidemic,
> disease outbreak, air contamination, terrorism, cyber event, blight,
> drought, infestation explosion, radiological accident, nuclear
> chemical, biological, or bacteriological release, water
> contamination, bridge failure or bridge collapse. Any such directive
> must be necessary to cope with the disaster and may provide for
> procedures reasonably necessary to enforce such directive. (New
> York State Senate Bill No. S7919 (2020)

It is unclear whether *Roman Catholic Diocese of Brooklyn* challenged the governor's power to

issue an executive order with such a sweeping scope because the legislature passed a law

transferring its constitutional authority to legislate to the executive branch.  The legislation passed

by New York's legislature did not imbue local executive branches throughout New York State

with any additional powers—including the Mayor of New York City.  Similarly, the New York

City Council did not pass any authority conveying unilateral regulatory authority onto the Mayor

of New York City.

The explicit language contained in Emergency Executive Order No. 225 states that

mandating the vaccine provides a basis for the locales selected.  The provision reads:

> WHEREAS, 56% of City residents are fully vaccinated and 62%
> have received at least one dose, and mandating vaccinations at the

12

# EXHIBIT 3

types of establishments that residents frequent will incentivize vaccinations, increasing the City's vaccination rates and saving lives…

While the burden never shifts to the government to justify its actions due to the lack of evidence submitted by petitioners, the City did include the affirmation of Jay Verma, MD where he offers an explanation mandating or "motivating[4]" individuals to comply with the edict issued by the government. The affirmation includes stellar academic and professional experiences which allows Dr. Varma to speak on matters of public health with authority and to advise New York City's leaders. Indeed Dr. Varma avers that he acts as "Mayor Bill de Blasio's Senior Advisor for Public Health." The accolades, stellar academic credentials, and a position of authority within the government does not obviate the requirement to follow procedures when either compelling the people to take an action, or suspending the people's ability to act a certain way.

A court may not rule on the Constitutionality of a governmental action based on speculation. A court may not seek to divine the "true" meaning or intentions of the petitioners before it, based on a tortured reading of their written application. Moreover, it is unclear whether an executive order, absent any state statute enabling the action taken, or a transfer of regulatory authority to the executive by City Council, proscribing that private individuals "take action" under the penalty of monetary fines even requires Constitutional scrutiny at all.

*Where does this leave us?*

The Court hears the grievances of the people and fully understands that legal arguments exist to challenge the actions taken against individuals by the government. They were not made here. Waving a purportedly "leaked" e-mail demonstrating selective enforcement of a

---

[4]    The government references "motivating" individuals 18-39 to vaccinate in its Memorandum of Law at pages 5 and 9. Webster's Dictionary defines "motivate" as to provide with a motive: IMPEL. Webster's Dictionary defines "impel" to urge or drive forward or on by or as if by the exertion of strong moral pressure.

13

FILED: WESTMORE COUNTY CLERK 02/00/2021 00:32 PM
NYSCEF DOC. NO. 13
INDEX NO. 160955/2021
RECEIVED NYSCEF: 02/00/2021

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 81 of 91

EXHIBIT 3

governmental action during a court proceeding or after arguments on the courthouse steps without either submitting it as evidence in admissible form or questioning whether the government had the authority to dictate such an action defines grandstanding. The people, through their advocates, must place justiciable issues before a court to allow it to rule. The people, through their elected representatives must introduce legislation and resolution in their respective houses to express their displeasure. A court may not create arguments on the people's behalf against government action, and it may not investigate their grievances, submit their evidence in admissible form in support of their arguments, and take steps to castigate a co-equal branch of government based on its feelings alone.

The Mayor of New York City's actions during this pandemic raise many questions. This includes, but in no way is limited to, whether the mayor of a local government may exercise a state's unacknowledged police power to motivate, compel, coerce, or whatever other adjective may exist, a population to receive a vaccination not mandated by its state government. Yet it, like so many other arguments, was not argued here.

In the United States the people are sovereign. The government does not convey rights to the people, but instead it is the people who convey power to the government. The government exists to protect the rights of all people, even if that means curtailing some of the freedoms we enjoy assuming the people act through the proper organs of government. It is procedure and its attendant processes that separates a functioning democratic republic from an autocracy that merely pays lip service to democratic principles and process. When a single individual attempts to impose a vision of morality by obviating the democratic process on a populace a sorry state of affairs exists.

Accordingly, it is hereby:

14

**EXHIBIT 3**

ORDERED, the Article 78 proceeding commenced by petitioners is denied and dismissed

in its entirety without prejudice.

ENTER,

Hon. Lizette Colon, J.S.C.[5]

DATED: September 10, 2021

---

[5]    The court thanks Richmond County's Law Department and the Chief Court Attorney, Jeffrey M. Alfano, Esq., for providing legal research on this decision and order.

15

# STATE OF NEW YORK

7919

# IN SENATE

March 2, 2020

_____

Introduced by Sen. STEWART-COUSINS -- (at request of the Governor) --
read twice and ordered printed, and when printed to be committed to
the Committee on Rules

AN ACT to amend the executive law, in relation to issuing by the gover-
nor of any directive necessary to respond to a state disaster emergen-
cy; making an appropriation therefor; and providing for the repeal of
certain provisions upon expiration thereof

**The People of the State of New York, represented in Senate and Assem-
bly, do enact as follows:**

 1    Section 1. Paragraph a of subdivision 2 of section 20 of the executive
 2   law, as amended by section 1 of part B of chapter 56 of the laws of
 3   2010, is amended to read follows:
 4     a. "disaster" means occurrence or imminent**, impending or urgent** threat
 5   of wide spread or severe damage, injury, or loss of life or property
 6   resulting from any natural or man-made causes, including, but not limit-
 7   ed to, fire, flood, earthquake, hurricane, tornado, high water, land-
 8   slide, mudslide, wind, storm, wave action, volcanic activity, epidemic,
 9   **disease outbreak,** air contamination, terrorism, cyber event, blight,
10   drought, infestation, explosion, radiological accident, nuclear, chemi-
11   cal, biological, or bacteriological release, water contamination, bridge
12   failure or bridge collapse.
13     § 2. Section 29-a of the executive law, as added by chapter 640 of the
14   laws of 1978, subdivision 1 as amended by section 7 of part G of chapter
15   55 of the laws of 2012, is amended to read as follows:
16     § 29-a. Suspension of other laws. 1. Subject to the state constitu-
17   tion, the federal constitution and federal statutes and regulations, the
18   governor may by executive order temporarily suspend [~~specific provisions~~
19   ~~of~~] any statute, local law, ordinance, or orders, rules or regulations,
20   or parts thereof, of any agency during a state disaster emergency, if
21   compliance with such provisions would prevent, hinder, or delay action
22   necessary to cope with the disaster **or if necessary to assist or aid in**
23   **coping with such disaster. The governor, by executive order, may issue**
24   **any directive during a state disaster emergency declared in the follow-**
25   **ing instances: fire, flood, earthquake, hurricane, tornado, high water,**

EXPLANATION--Matter in **italics** (underscored) is new; matter in brackets
[~~-~~] is old law to be omitted.

LBD12048-08-0

S. 7919                                    2

1  **landslide, mudslide, wind, storm, wave action, volcanic activity,**
2  **epidemic, disease outbreak, air contamination, terrorism, cyber event,**
3  **blight, drought, infestation, explosion, radiological accident, nuclear,**
4  **chemical, biological, or bacteriological release, water contamination,**
5  **bridge failure or bridge collapse. Any such directive must be necessary**
6  **to cope with the disaster and may provide for procedures reasonably**
7  **necessary to enforce such directive**
8     2. Suspensions pursuant to subdivision one of this section shall be
9  subject to the following standards and limits**, which shall apply to any**
10 **directive where specifically indicated**:
11    a. no suspension **or directive** shall be made for a period in excess of
12 thirty days, provided, however, that upon reconsideration of all of the
13 relevant facts and circumstances, the governor may extend the suspension
14 for additional periods not to exceed thirty days each;
15    b. no suspension **or directive** shall be made which [~~does not safeguard~~
16 ~~the~~] **is not in the interest of the** health [~~and~~] **or** welfare of the public
17 and which is not reasonably necessary to **aid** the disaster effort;
18    c. any such suspension order shall specify the statute, local law,
19 ordinance, order, rule or regulation or part thereof to be suspended and
20 the terms and conditions of the suspension;
21    d. the order may provide for such suspension only under particular
22 circumstances, and may provide for the alteration or modification of the
23 requirements of such statute, local law, ordinance, order, rule or regu-
24 lation suspended, and may include other terms and conditions;
25    e. any such suspension order **or directive** shall provide for the mini-
26 mum deviation from the requirements of the statute, local law, ordi-
27 nance, order, rule or regulation suspended consistent with the **goals of**
28 **the** disaster action deemed necessary; and
29    f. when practicable, specialists shall be assigned to assist with the
30 related emergency actions to avoid needless adverse effects resulting
31 from such suspension.
32    3. Such suspensions **or directives** shall be effective from the time and
33 in the manner prescribed in such orders and shall be published as soon
34 as practicable in the state bulletin.
35    4. The legislature may terminate by concurrent resolution executive
36 orders issued under this section at any time.
37    § 3. The sum of forty million dollars ($40,000,000) is hereby appro-
38 priated for transfer by the governor to the general, special revenue,
39 capital projects, proprietary or fiduciary funds of any agency, depart-
40 ment, or authority for services and expenses related to the outbreak of
41 coronavirus disease 2019 (COVID-19). Such funds shall be used for
42 purposes including, but not limited to, additional personnel, equipment
43 and supplies, travel costs, and trainings. A portion of these funds may
44 be made available as state aid to municipalities for services and
45 expenses related to the outbreak of coronavirus disease 2019 (COVID-19).
46 Such funds shall be available for payment of financial assistance here-
47 tofore accrued or hereafter to accrue. Any disbursements from this
48 appropriation shall be distributed pursuant to a plan approved by the
49 director of the budget.
50    § 4. This act shall take effect immediately and sections one and two
51 of this act shall expire and be deemed repealed April 30, 2021.

# STATE OF NEW YORK

9953

# IN ASSEMBLY

March 2, 2020

───────────

Introduced  by  M.  of  A.  ORTIZ -- (at request of the Governor) -- read
once and referred to the Committee on Ways and Means

AN ACT to amend the executive law, in relation to issuing by the  gover-
nor of any directive necessary to respond to a state disaster emergen-
cy;  making an appropriation therefor; and providing for the repeal of
certain provisions upon expiration thereof

   *The People of the State of New York, represented in Senate and  Assem-
bly, do enact as follows:*

1    Section 1. Paragraph a of subdivision 2 of section 20 of the executive
2  law,  as  amended  by  section  1 of part B of chapter 56 of the laws of
3  2010, is amended to read follows:
4    a. "disaster" means occurrence or imminent*, impending or urgent* threat
5  of wide spread or severe damage, injury, or loss  of  life  or  property
6  resulting from any natural or man-made causes, including, but not limit-
7  ed  to,  fire,  flood, earthquake, hurricane, tornado, high water, land-
8  slide, mudslide, wind, storm, wave action, volcanic activity,  epidemic,
9  *disease outbreak,*  air  contamination,  terrorism, cyber event, blight,
10 drought, infestation, explosion, radiological accident, nuclear,  chemi-
11 cal,  biological,  or bacteriological release, water contamination, bridge
12 failure or bridge collapse.
13   § 2. Section 29-a of the executive law, as added by chapter 640 of the
14 laws of 1978, subdivision 1 as amended by section 7 of part G of chapter
15 55 of the laws of 2012, is amended to read as follows:
16   § 29-a. Suspension  of  other laws. 1. Subject to the state constitu-
17 tion, the federal constitution and federal statutes and regulations, the
18 governor may by executive order temporarily suspend [~~specific provisions~~
19 ~~of~~] any statute, local law, ordinance, or orders, rules or  regulations,
20 or  parts  thereof,  of any agency during a state disaster emergency, if
21 compliance with such provisions would prevent, hinder, or  delay  action
22 necessary  to cope with the disaster *or if necessary to assist or aid in*
23 *coping with such disaster.  The governor, by executive order, may  issue*
24 *any  directive during a state disaster emergency declared in the follow-*
25 *ing instances: fire, flood, earthquake, hurricane, tornado, high  water,*
26 *landslide,  mudslide,  wind,  storm,  wave  action,  volcanic  activity,*

EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets
[~~-~~] is old law to be omitted.

LBD12048-08-0

A. 9953                                    2

1  **epidemic, disease outbreak, air contamination, terrorism, cyber event,**
2  **blight, drought, infestation, explosion, radiological accident, nuclear,**
3  **chemical, biological, or bacteriological release, water contamination,**
4  **bridge failure or bridge collapse. Any such directive must be necessary**
5  **to cope with the disaster and may provide for procedures reasonably**
6  **necessary to enforce such directive.**
7  2. Suspensions pursuant to subdivision one of this section shall be
8  subject to the following standards and limits**, which shall apply to any**
9  **directive where specifically indicated**:
10  a. no suspension **or directive** shall be made for a period in excess of
11  thirty days, provided, however, that upon reconsideration of all of the
12  relevant facts and circumstances, the governor may extend the suspension
13  for additional periods not to exceed thirty days each;
14  b. no suspension **or directive** shall be made which [~~does not safeguard~~
15  ~~the~~] **is not in the interest of the** health [~~and~~] **or** welfare of the public
16  and which is not reasonably necessary to **aid** the disaster effort;
17  c. any such suspension order shall specify the statute, local law,
18  ordinance, order, rule or regulation or part thereof to be suspended and
19  the terms and conditions of the suspension;
20  d. the order may provide for such suspension only under particular
21  circumstances, and may provide for the alteration or modification of the
22  requirements of such statute, local law, ordinance, order, rule or regu-
23  lation suspended, and may include other terms and conditions;
24  e. any such suspension order **or directive** shall provide for the mini-
25  mum deviation from the requirements of the statute, local law, ordi-
26  nance, order, rule or regulation suspended consistent with the **goals of**
27  **the** disaster action deemed necessary; and
28  f. when practicable, specialists shall be assigned to assist with the
29  related emergency actions to avoid needless adverse effects resulting
30  from such suspension.
31  3. Such suspensions **or directives** shall be effective from the time and
32  in the manner prescribed in such orders and shall be published as soon
33  as practicable in the state bulletin.
34  4. The legislature may terminate by concurrent resolution executive
35  orders issued under this section at any time.
36  § 3. The sum of forty million dollars ($40,000,000) is hereby appro-
37  priated for transfer by the governor to the general, special revenue,
38  capital projects, proprietary or fiduciary funds of any agency, depart-
39  ment, or authority for services and expenses related to the outbreak of
40  coronavirus disease 2019 (COVID-19). Such funds shall be used for
41  purposes including, but not limited to, additional personnel, equipment
42  and supplies, travel costs, and trainings. A portion of these funds may
43  be made available as state aid to municipalities for services and
44  expenses related to the outbreak of coronavirus disease 2019 (COVID-19).
45  Such funds shall be available for payment of financial assistance here-
46  tofore accrued or hereafter to accrue. Any disbursements from this
47  appropriation shall be distributed pursuant to a plan approved by the
48  director of the budget.
49  § 4. This act shall take effect immediately and sections one and two
50  of this act shall expire and be deemed repealed April 30, 2021.

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM    INDEX NO. 160914/2021
NYSCEF DOC. NO. 9    Case 1:21-cv-10752-JSR-BCM    Document 5-1    Filed 12/16/21    RECEIVED NYSCEF: 12/01/2021

EXHIBIT 5



**EMPIRE CITY LABORATORIES**

229 49th Street
Brooklyn, NY 11220-1708
Tel. (718) 788-3840
Fax. (718) 788-3871

**Fermina M. Mazzella, MD**
Laboratory Director
CLIA No: 33D1057336

Phys: **NEW YORK PREVENTIVE HEALTH CENTER**

Patient:
DOB:
Phone:
Spec#

Gender:
Fasting: U

Chart#: 27166
First reported on:

Coll. Date: 10/20/21
Coll. Time: 15:45
10/21/2021 10:41

Recv. Date: 10/21/21
Recv. Time: 02:01
Final report date: 10/21/2021 10:41

Print. Date: 10/21/21
Print. Time: 10:41

| Test Name | In Range | Out of Range | Reference | Units |
|-----------|----------|--------------|-----------|-------|

**COVID-19**
2019 NOVEL CORONAVIRUS (COVID-19) RNA, QL RT-PCR
SARS-COV-2           Not Detected           Not Detected

Testing was performed using the Cobas 6800/8800 SARS-CoV-2 test using a
Nasopharyngeal/ Pharyngeal swab. This test has been authorized by FDA under
an Emergency Use Authorization (EUA). This test is only authorized for the
duration of time the declaration that circumstances exist justifying the
authorization of the emergency use of in vitro diagnostic tests for
detection of SARS-CoV-2 virus and/or diagnosis of COVID-19 infection
under section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless
the authorization is terminated or revoked sooner.

**EXHIBIT 5**



229 49th Street
Brooklyn, NY 11220-1708
Tel. (718) 788-3840
Fax. (718) 788-3871

**Fermina M. Mazzella, MD**
Laboratory Director
CLIA No: 33D1057336



| | | |
|---|---|---|
| Phys: **NEW YORK PREVENTIVE HEALTH CENTER** | Patient: | |
| | DOB: | Gender: |
| | Phone: | Fasting: U |
| | Spec#: | |

ALI, LAALI MD
Accession: **2111013847**      Coll. Date: 11/01/21      Recv. Date: 11/02/21      Print. Date: 11/02/21
Chart#: 27166               Coll. Time: 15:26      Recv. Time: 01:27      Print. Time: 07:34
First reported on:          11/02/2021 07:34      Final report date: 11/02/2021 07:34

| Test Name | In Range | Out of Range | Reference | Units |
|---|---|---|---|---|
| **COVID-19** | | | | |
| 2019 NOVEL CORONAVIRUS (COVID-19) RNA, QL RT-PCR | | | | |
| SARS-COV-2 | | Not Detected | Not Detected | |

Testing was performed using the Cobas 6800/8800 SARS-CoV-2 test using a
Nasopharyngeal/ Pharyngeal swab. This test has been authorized by FDA under
an Emergency Use Authorization (EUA). This test is only authorized for the
duration of time the declaration that circumstances exist justifying the
authorization of the emergency use of in vitro diagnostic tests for
detection of SARS-CoV-2 virus and/or diagnosis of COVID-19 infection
under section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless
the authorization is terminated or revoked sooner.



**EXHIBIT 6**

**labcorp**

**Patient Report**

| Patient ID: 8▮▮▮▮▮▮ | Age: | Account Number: |
| Specimen ID: | Sex: | Ordering Physician: |

---

Ordered Items: **SARS-CoV-2 Semi-Quant Total Ab; Venipuncture**

| Date Collected: **08/19/2021** | Date Received: **08/19/2021** | Date Reported: **08/20/2021** | Fasting: **Yes** |

## SARS-CoV-2 Semi-Quant Total Ab

| Test | Current Result and Flag | Previous Result and Date | Units | Reference Interval |
|------|------------------------|--------------------------|-------|--------------------|
| SARS-CoV-2 Semi-Quant Total Ab A, 01 | 74.5 | | U/mL | Negative<0.8 |

> Antibodies against the SARS-CoV-2 spike protein receptor binding
> domain (RBD) were detected. It is yet undetermined what level of
> antibody to SARS-CoV-2 spike protein correlates to immunity against
> developing symptomatic SARS-CoV-2 disease. Studies are underway to
> measure the quantitative levels of specific SARS-CoV-2 antibodies
> following vaccination. Such studies will provide valuable insights
> into the correlation between protection from vaccination and
> antibody levels.

| SARS-CoV-2 Spike Ab Interp A, 01 | Positive | | | |

> Roche Elecsys Anti-SARS-CoV-2 S

**Disclaimer**
The Previous Result is listed for the most recent test performed by Labcorp in the past 3 years where there is sufficient patient demographic data to match the result to the patient.

**Icon Legend**
▲ Out of reference range   ■ Critical or Alert

**Comments**
A: This test has not been FDA cleared or approved. This test has been authorized by FDA under an Emergency Use Authorization (EUA). This test is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of in vitro diagnostics for detection and/or diagnosis of COVID-19 under Section 564(b)(1) of the Act, 21 U.S.C. 360bbb-3(b)(1), unless the authorization is terminated or revoked sooner. This test has been authorized only for detecting the presence of antibodies against SARS-CoV-2, not for any other viruses or pathogens.

**Performing Labs**
01: RN - LabCorp Raritan 69 First Avenue, Raritan, NJ, 08869-1800 Dir: Araceli B Reyes, MD
For Inquiries, the physician can contact Branch: 800-762-4344 Lab: 800-631-5250

---



| | **Physician Details** | **Specimen Details** |
| | M ABRAHAM | Specimen ID: 231-436-3984-0 |
| | **LabCorp com COVID19 Testing07** | Control ID: 86021359 |
| | **531 South Spring Street, Burlington, NC, 27215** | Alternate Control Number: 86021359 |
| | | Date Collected: 08/19/2021 0752 Local |
| | Phone: 8▮ | Date Received: 08/19/2021 0000 ET |
| | Account | Date Entered: 08/19/2021 1146 ET |
| | Physician | Date Reported: 08/20/2021 2035 ET |
| | NPI: **1740299965** | Rte: 00 |

---

**labcorp**

Date Issued 08/20/21 2036 ET **Final Report** Page 1 of 1

©1995 2021 Laboratory Corporation of America® Holdings
All Rights Reserved   Enterprise Report Version 2.00

This document contains private and confidential health information protected by state and federal law.
If you have received this document in error please call 800 631 5250.

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 90 of 91

**EXHIBIT 7**



# OPERATIONS ORDER

| SUBJECT: | **COVID-19 NON-COMPLIANCE LEAVE WITHOUT PAY PROPERTY GUIDELINES** |
|---|---|

| DATE ISSUED: | | NUMBER: |
|---|---|---|
| **11-05-21** | | ▬■▬ |

      1.      When a member of the service is placed on leave without pay status pursuant to either a "Mayoral Executive Order 78 Non-Compliance Report" (regarding mask wearing and polymerase chain reaction (PCR) testing), or a "Department of Health and Mental Hygiene (DOHMH) Order Non-Compliance Report" (regarding proof of vaccination for COVID-19), commanding officers will comply with *P.G. 205-21, "Leave Without Pay[],"* steps "10" through "14." These steps require members of the service to surrender firearm(s), and certain Department property, regardless of the duration of the leave. For members of the service placed on leave without pay pursuant to past or future Mayoral Executive Orders, DOHMH Commissioner's Orders, or other City mandate specific to the COVID-19 pandemic, the procedure detailed in P.G. 205-21, steps "1" through "9" is superseded by Administrative Bulletin entitled "Leave Without Pay - Supervisor Instructions" issued on October 29, 2021.

      2.      Pursuant to step "10" of P.G. 205-21, upon placing a member of the service on leave without pay, commanding officers must ensure that member's firearm(s) and all Department property are surrendered and indicate such on **PROPERTY RECEIPT - DISCONTINUANCE OF SERVICE (PD520-013)**. The commanding officer must ensure that the **PROPERTY RECEIPT - DISCONTINUANCE OF SERVICE** is delivered to the Military and Extended Leave Desk (MELD). Members of the service will be permitted to retain Department issued smartphones. All other property will be vouchered and stored in the normal course. Integrity control officers must forward parking permits to the Chief of Department's Vehicle Identification Unit, and **IDENTIFICATION CARD (PD416-091)** and shield, if applicable, must be forwarded to the Shield, ID and Uniform Services Unit. After 30 days on leave without pay, the Commanding Officer, Personnel Orders Division will direct transfer of members of the service to MELD.

      3.      This procedure will apply retroactively to members of the service who have already been placed on leave without pay pursuant to either a "Mayoral Executive Order 78 Non-Compliance Report" or a "Department of Health and Mental Hygiene (DOHMH) Order Non-Compliance Report." Commanding officers are required to direct members of the service on leave without pay to report to their assigned command on Wednesday, November 10, 2021, and surrender all applicable Department property as indicated in P.G. 205-21. Commanding officers will comply with the process outlined above.

      4.      Commanding officers are reminded that all members of the service with timely reasonable accommodation requests, or who have been granted reasonable accommodation requests, are obligated to comply with face covering requirements and continue to provide proof of a negative COVID-19 PCR test diagnostic test taken within the preceding seven days. Note that procedures detailed in P.G. 205-21 apply to both uniformed and civilian members of the service. Leave without pay will be terminated and the member of the service will be returned to paid status immediately upon the member providing proof of vaccination for COVID-19 to the Department.

      5.      Members of the service are reminded that it is normal to experience stress or anxiety in connection with the COVID-19 pandemic. Regardless of rank or title, the Department's Health and Wellness Section offers many support options and can connect members of the service with resources inside or outside of the Department. More information is available by visiting the Health and Wellness app on Department

FILED: NEW YORK COUNTY CLERK 12/01/2021 01:31 PM

NYSCEF DOC. NO. 11

INDEX NO. 160914/2021

RECEIVED NYSCEF: 12/01/2021

Case 1:21-cv-10752-JSR-BCM   Document 5-1   Filed 12/16/21   Page 91 of 91

**EXHIBIT 7**

smartphones, or by clicking the Health and Wellness logo on the Department Intranet homepage. Members of the service may also contact the Employee Assistance Unit at (646) 610-6730 or at Wellness@nypd.org.

6.    Commanding officers will ensure that the contents of this Order are brought to the attention of members of their commands.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

**OPERATIONS ORDER NO.** ▮