UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY MARCIANO,<br><br>　　　　　Plaintiff,<br><br>　　-against-<br><br>BILL DE BLASIO, MAYOR OF THE CITY<br>OF NEW YORK, in his official<br>capacity, DAVE A. CHOCKSHI,<br>COMMISSIONER OF HEALTH AND MENTAL<br>HYGIENE, in his official capacity,<br>DERMOT SHEA, POLICE COMMISSIONER,<br>in his official capacity, THE NEW<br>YORK CITY BOARD OF HEALTH, and THE<br>CITY OF NEW YORK,<br><br>　　　　　Defendants. | 21-cv-10752 (JSR)<br><br>MEMORANDUM ORDER |

JED S. RAKOFF, U.S.D.J.

In the two years since the first confirmed COVID-19 case in New York City was reported on March 1, 2020, the virus has inflicted death and disruption upon the City on a scale unparalleled in recent memory.[1] Seeking to control and mitigate the virus's impact, the New York City Board of Health has put into place various measures. Among these measures was an order, first issued by the Commissioner of the City's Department of Health and

---

[1] According to the most recent data, at least 39,903 individuals have died of COVID-19 in New York City. See "Trends and Totals," NYC Health, https://www1.nyc.gov/site/doh/covid/covid-19-data-totals.page (last accessed March 7, 2022).

1

Mental Hygiene on October 20, 2021, requiring all City employees and certain contractors to be vaccinated against COVID-19.

Plaintiff Anthony Marciano, a detective with the New York City Police Department ("NYPD"), commenced this action in New York State Supreme Court, from which it was subsequently removed to this Court, challenging the Commissioner's October 20, 2021 order as facially invalid under state law and as violating his federal constitutional right to substantive and procedural due process. Listed as defendants in this action were Bill de Blasio, in his (former) official capacity as Mayor of the City of New York, Dave A Chokshi, in his official capacity as Commissioner of Health and Mental Hygiene, Dermot Shea, in his (former) official capacity as Police Commissioner, the New York City Board of Health, and the City of New York.[2]

Defendants have now moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim, respectively. See ECF No.

---

[2] As of the date of this Memorandum Opinion, Eric Adams is Mayor of the City of New York and Keechant Sewell is the New York City Police Commissioner. When a government official is sued in an official capacity and subsequently leaves office, the official's successor is automatically substituted. See Fed. R. Civ. P. 25(d). Were this case to continue beyond the motions disposed of here, it would be appropriate to substitute-in the successors of the named government officials. Marciano's complaint also misspells Commissioner Chokshi's name as "Dave A. Chockshi," which it would similarly be appropriate to correct were the case to move forward.

27. For the reasons set forth below, the motion to dismiss for lack of subject matter jurisdiction is denied, the motion to dismiss for failure to state a claim is granted, and the complaint is dismissed with prejudice.

## BACKGROUND

A. Factual Background

The New York City Board of Health (the "Board") is part of the City's Department of Health and Mental Hygiene (the "Department") and consists of the Commissioner of that Department, the Chairperson of the Department's Mental Hygiene Advisory Board, and nine other members, appointed by the Mayor. See New York City Charter ("Charter") § 553.

On March 25, 2020, David Chokshi, the Department's Commissioner, declared a public health emergency within New York City to address the threat posed by COVID-19 to the health and welfare of City residents. See ECF 28-1 ("Order") at 2. That order remains in effect. Id. The Commissioner's declaration followed Mayor De Blasio's issuance of Emergency Executive Order No. 98, which similarly declared a state of emergency in the City to address the threat posed by the pandemic to the City residents — and that executive order also remains in effect. Id. A week after Commissioner Chokshi's declaration, the first wave of the pandemic hit its peak within the City, with approximately 1,850 daily hospitalizations reported on March 30, 2020. ECF 1-1 ¶ 66.

In late 2020, the first COVID-19 vaccine — developed by Pfizer and BioNTech — was granted emergency use authorization by the Food and Drug Administration ("FDA").  See ECF 1-1 ("Complaint") ¶ 126. Subsequently, on August 23, 2021, the FDA granted full approval to the Pfizer-BioNTech vaccine for individuals 16 years of age and older.[3]  In a press release announcing the vaccine's approval, the FDA stated that the vaccine had proven "91% effective in preventing COVID-19 disease" in clinical trials.[4]  The following week, Mayor de Blasio issued Executive Order No. 78, requiring that, beginning September 13, 2021, City employees and covered City contractors either be vaccinated against COVID-19 or be tested for COVID-19 on a weekly basis.  See Order at 3.

Pursuant to his prior declaration of a public health emergency, Commissioner Chokshi, on October 20, 2021, issued an order (the "Department's Order" or the "Order") requiring COVID-19 vaccinations for City employees and certain City contractors. See id.  In setting out the justification for the Order, Commissioner Chokshi noted, among other things, that, that the U.S. Centers for Disease Control and Prevention ("CDC") "has stated that vaccination is an effective tool to prevent the spread of

---

[3] See "FDA Approves First COVID-19 Vaccine" (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (see Complaint ¶ 126 n.9).

[4] Id.

COVID-19 and the development of new variants, and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated." Id. at 2. He also noted that, according to one study, "the Department's vaccination campaign was estimated to have prevented about 250,000 COVID-19 cases, 44,000 hospitalizations, and 8,300 deaths from COVID-19 infection since the start of vaccination through July 1, 2021," and that "the number of prevented cases, hospitalizations, and death has risen since then." Id. The Board ratified the Department's Order by a unanimous vote on November 1, 2021. ECF No. 28-2 at 22.

The Order set a deadline of 5:00 p.m. on October 29, 2021 by which time City employees "must provide proof to the agency or office where they work that either (1) they have been fully vaccinated against COVID-19; or (2) they have received a single dose COVID-19 vaccine, even if two weeks have not passed since they received the vaccine; or (3) they have received the first dose of a two-dose COVID-19 vaccine." See id. at 5. Further, under the Order, any City employee who has not provided the above-described proof must be excluded from their assigned work location beginning on November 1, 2021. See id. at 4. The Order specifically states that it shall not "be construed to prohibit any reasonable accommodations otherwise required by law." Id. at 6.

After the Order was issued, the City published a set of Frequently Asked Questions ("FAQs") to clarify the application of the vaccine mandate.[5]  The FAQs state that, "[b]eginning November 1, [2021,] City staff who are not in compliance with the vaccine mandate and have not applied for a reasonable accommodation will be placed on Leave Without Pay" ("LWOP").  Id.  The FAQs further explain that an employee may be immediately "removed from LWOP" and restored to payroll if he or she arrives at work with proof of one dose of a vaccine; however, "[e]mployees who refuse to comply will be terminated in accordance with procedures required by the Civil Service Law or applicable collective bargaining agreement."  Id.

Subsequently, the NYPD issued an Administrative Bulletin advising members of the police force of the Order and its requirements.  See ECF No. 20-3.  Then, on November 10, 2021, Police Commissioner Shea issued Operations Order 49, which incorporated the requirements of both Mayor de Blasio's August 31, 2021 Executive Order and the Department's Order, including the requirement that NYPD employees who are not in compliance with

---

[5]  "FAQ on New York City Employees Vaccine Mandate," https://www1.nyc.gov/assets/dcas/downloads/pdf/guidelines/faq-vaccine-mandate.pdf (last accessed February 22, 2022).  The Court may take judicial notice of these state agency-promulgated guidelines in deciding the motion to dismiss.  See T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist., 2012 WL 860367, at *4 n.1 (S.D.N.Y. Feb. 27, 2012).

these order would be placed on LWOP.  <u>See</u> ECF No. 20-4.  The order also sets out a process by which NYPD employees may seek a reasonable accommodation to be exempted from the Department's Order and provides that any member of the service with a pending application may continue to report to duty so long as he or she undergoes weekly COVID-19 testing.  <u>Id.</u> at 2.

Plaintiff Anthony Marciano is a detective with the NYPD.  <u>See</u> Complaint ¶ 44; ECF 31-1 ¶ 1.  Marciano has served as a member of the City's police force through the pandemic, including after contracting and recovering from COVID-19 in March of 2020.  <u>See</u> Complaint ¶ 91.  Following the issuance of Police Commissioner Shea's order, Plaintiff Marciano applied for an accommodation exempting him from the Department's Order, citing religious objections.  <u>See</u> ECF 8-1 at 24.  In accordance with the NYPD's procedures, he was not put on LWOP pending a decision on his accommodation request.  <u>See</u> ECF 8-1 at 24.  On February 8, 2022, Marciano was notified that his accommodation request was denied, and he was given seven days to appeal the decision before it was put into effect.  ECF No. 30-6.  Marciano timely proceeded with such an appeal on February 11, 2021, and, as a result, he remains on active duty pending a final decision regarding his accommodation request.  ECF No. 32 at 2.

B. Procedural Background

On December 6, 2021, Marciano commenced this action in New York State Supreme Court by filing a complaint[6] on behalf of himself and "others similarly situated" against the defendants challenging the vaccine mandate imposed by the Department's Order and seeking a temporary restraining order ("TRO") preventing the implementation of the mandate as well as a declaration that the Order is void. Complaint at 2. The complaint asserts four claims: (1) "separation of powers" under the New York State Constitution, id. ¶¶ 235-40; (2) preemption by state law, ¶¶ 241-44; (3) substantive due process, brought pursuant to 42 U.S.C. § 1983, id. ¶¶ 245-49; and (4) procedural due process, brought pursuant to 42 U.S.C. § 1983, id. ¶¶ 250-53.

On December 14, 2021, both parties appeared before the Honorable Justice Nervo of the New York State Supreme Court for oral argument concerning Marciano's TRO application. At the conclusion of oral argument, Justice Nervo issued an oral decision from the bench granting the TRO. See ECF No. 20-5 at 48. The next day, on December 15, 2021, defendants timely removed the

---

[6] Although stylized as a hybrid complaint and Article 78 petition, nevertheless, because the complaint exclusively sought to challenge the Order on facial grounds, it was an Article 78 petition in name only. See Corbett v. City of New York, 816 Fed. App'x 551 (2020) (An Article 78 court "may not rule on [a regulation's] facial validity" (citing Hachamovitch v. DeBuono, 159 F.3d 687, 695 (2d Cir. 1998)).

action to this Court pursuant to 28 U.S.C. §§ 1441 and 1443 based on Marciano's federal claims, <u>viz.</u>, his third and fourth claims alleging substantive and procedural due process violations, respectively. <u>See</u> ECF No. 5. Subsequently, on December 23, 2021, Marciano filed an emergency motion seeking that his state law claims be severed and remanded to the state court. ECF No. 17. On December 27, 2021, defendants filed a motion to vacate the TRO issued by the New York State Supreme Court. ECF No. 18.

On December 29, 2021, the parties appeared remotely before this Court for oral argument on Marciano's motion to remand the state law claims to the state court and defendants' motion to vacate the TRO. First, the Court denied Marciano's motion to sever and remand his state law claims. ECF No. 24 at 16. Next, noting that Marciano's reasonable accommodation request was still pending and, as a result, he was continuing to be paid his salary and work in his position, the Court granted defendants' motion, vacating the TRO, although without prejudice to plaintiff bringing a renewed application for a TRO if his circumstances changed. ECF No. 24 at 28. The Court then set a briefing schedule with respect to defendants' motion to dismiss Marciano's complaint.[7]

---

[7] Subsequently, on January 13, 2022, Justice Nervo issued a Decision and Order in which he concluded that, notwithstanding defendants' removal of the matter to this Court, the state court retained jurisdiction — at least insofar as a federal court had not yet granted the motion to remove — and denied Marciano's complaint on the merits. <u>See</u> ECF 28-8. Because this order was

On February 8, Marciano filed a renewed TRO motion, citing the City's denial of his request for reasonable accommodation. ECF No. 30-1. Oral argument on defendants' motion to dismiss and Marciano's renewed TRO motion was held before this Court on February 28, 2022. At the hearing, the Court denied Marciano's renewed TRO motion, citing, among other reasons, that Marciano remains on active duty while his appeal of the denial of his accommodation request is pending. See Transcript of February 28, 2022 Hearing.

### LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).[8] To do so, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial

issued after defendants' notice of removal was filed, it is void and without effect. See N.Y. State Nat'l Org. for Women v. Terry, 697 F. Supp. 1324, 1330 n.5 (S.D.N.Y. 1988) (citing United States ex rel. Echevarria v. Silberglitt, 441 F.2d 225, 227 (2d Cir. 1971)).

[8] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In applying this standard, the Court accepts as true all well-pled factual allegations but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id.

In deciding a motion pursuant to Rule 12(b)(6), "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." Jovani Fashion, Ltd. v. Cinderella Divine, Inc., 808 F. Supp. 2d 542, 545 (S.D.N.Y. 2011) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002)), aff'd, 500 F. App'x 42 (2d Cir. 2012).  In resolving a challenge to standing under Rule 12(b)(1), "the Court may consider extrinsic evidence proffered by the parties in addition to facts alleged in the pleadings." Bekker v. Neuberger Berman Grp. LLC, 2018 WL 4636841, at *3 (S.D.N.Y. Sept. 27, 2018).

## DISCUSSION

Defendants move to dismiss Marciano's complaint both for failure to state a claim, pursuant to Rule 12(b)(6), and for lack of standing, pursuant to Rule 12(b)(1).  Because defendants'

challenge to standing implicates whether the Court has the subject matter jurisdiction necessary to consider the merits of the action, see Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir.1990), the Court first addresses Marciano's standing to pursue this action.

I.   Standing

To satisfy the "irreducible constitutional minimum of standing . . . the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  Defendants' arguments concern the first of these three elements — injury in fact.  An injury in fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 339.  Because Marciano has not yet actually been put on LWOP or terminated pending the resolution of his appeal of the denial of his request for accommodation, defendants argue that he faces at most a hypothetical harm, insufficient to give rise to standing. The Court disagrees.

Satisfying the injury-in-fact requirement is "a low threshold which helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017).  Accordingly, a threatened

injury in the future is sufficient to satisfy standing so long as the injury is "certainly impending[] or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014). Although it is true that Marciano's departmental appeal is still pending and, as a result, he has neither been placed on LWOP or terminated, defendants have not offered any reason to conclude that an ultimate denial of his accommodation request is anything but very likely. Indeed, the evidence submitted by Marciano, including an internal guidance document for reviewing accommodation requests and a sworn affidavit from the executive director of the NYPD's Equal Employment Opportunity Division, see ECF Nos. 31-15, 31-25, strongly suggests that his accommodation request — based on purported objections to fetal cell derivative research — will ultimately be denied.

Accordingly, the Court denies the motion to dismiss for lack of standing and proceed to the merits.[9]

---

[9] The Court's determination that Marciano has standing to proceed with this suit is not inconsistent with its prior holding that Marciano failed to establish a sufficiently immediate harm to justify a TRO. "[E]stablishing that there is a substantial threat of irreparable injury on a motion for preliminary injunction is a much taller task than showing injury-in-fact to survive a motion to dismiss." Gbalazeh v. City of Dallas, 394 F. Supp. 3d 666, 672 (N.D. Tex. 2019); see also Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1022 (9th Cir. 2016) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."). While the allegations and

II.  <u>Ultra Vires</u>

Marciano's first cause of action seeks a declaration that the Department's Order is facially invalid as an <u>ultra vires</u> act under the New York State Constitution.  However, as recent case law has made clear, the Commissioner and the Board's authority to issue the sort of vaccination requirement at issue here is firmly established.

In particular, the Board's authority to mandate vaccinations was confirmed by the Court of Appeals of New York in its decision in <u>Garcia v. New York City Department of Health & Mental Hygiene</u>, 31 N.Y.3d 601 (2018).  As the court explained in that case, the New York City Charter, as enacted by the state legislature, "empowers the Department with 'jurisdiction to regulate all matters affecting health in the city of New York and to perform all those functions and operations performed by the city that relate to the health of the people of the city,'" including in matters relating to the "control of communicable and chronic

---

limited evidence proffered by the parties in connection to the 12(b)(1) motion to dismiss suggest a sufficiently likely injury so as to ensure Marciano has a "personal stake in the outcome of the controversy," <u>Whole Foods</u>, 853 F.3d at 767, that Marciano's pay continues for the time being has provided the Court sufficient opportunity to reach a decision on the merits before any harm is actually suffered, obviating the need for a TRO, <u>see</u> <u>Citibank N.A. v. Citytrust</u>, 756 F.2d 273, 275 (2d Cir. 1985) ("[T]he single most important prerequisite for the issuance of a preliminary injunction is a demonstration that, if not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.").

disease and conditions hazardous to life and health." Id. at 610 (quoting Charter § 556).

Consistent with this broad grant of jurisdiction, Section 17-109 of the New York City Administrative Code "delegates to the Department — and by extension, the Board — the power 'to collect and preserve pure vaccine lymph or virus, produce diphtheria antitoxin and other vaccines and antitoxins, and add necessary additional provisions to the health code in order to most effectively prevent the spread of communicable diseases'" and "to take measures . . . for general and gratuitous vaccinations." Id. at 610-11 (quoting New York City Admin. Code § 17-109(a), (b)). Concluding that these provisions constituted a "legislative delegation of authority" sufficient to enable the Board "to adopt vaccination measures," the Court of Appeals upheld the Board's rule mandating influenza vaccines for children attending city-regulated childcare or school-based programs. Id. at 611.

In reaching this conclusion, the Court of Appeals acknowledged that "the flu vaccine rules necessarily impinge upon personal choice to some degree," but explained that "the rules challenged here do not relate merely to a personal choice about an individual's own health but, rather, seek to ensure increased public safety and health for the citizenry by reducing the prevalence and spread of a contagious infectious disease." Id. at 612. Accordingly, there was a "very direct connection between the

flu vaccine rules and the preservation of health and safety," placing the vaccine measures in question clearly within the Board's purview. <u>Id.</u> at 612.

The same can be said about Board's requirement that City employees and contractors be vaccinated against COVID-19. As Commissioner Chokshi explained in promulgating the Order, "a system of vaccination for individuals providing City services and working in City offices will potentially save lives, protect public health, and promote public safety," both because vaccination protects the City employees and contractors themselves from serious illness and death and because it reduces the risk that those employees and contractors will transmit the disease to those members of the public they serve. ECF 28-1 at 2. Indeed, it is not hard to see how that rationale applies with full force to the city's police department, Marciano included: The NYPD's officers regularly interact with the public, whom they have sworn to protect, often in emergency situations where close contact is unavoidable. It is incumbent on the City to take steps that mitigate the health risks such interactions with the police pose to its residents, thus reinforcing the public trust on which effective policing relies.

In <u>Garcia</u>, the Court of Appeals explained that the Board's authority to require vaccination was further supported by "the Board's long history of mandating immunizations for children

attending City-regulated child care programs beyond those required by the [state] legislature" — a history beginning no later than 1866, when the Board, in a predecessor form, mandated smallpox vaccinations for minors. 31 N.Y.3d at 613-14. Notably, the Board's deep history of such actions similarly supports its authority to impose vaccination as a condition of employment for those in service of the City. As the Court of Appeals recognized when upholding the constitutionality of the Board's predecessor over a century and a half ago, the City's health officials have long been endowed with immense control "over persons and property, so far as the public health was concerned," including the authority "to regulate, abate or remove all trades or manufactures that might be by them deemed injurious to the public health." Metropolitan Bd. of Health v. Heister, 37 N.Y. 661, 670 (1868); see also John Fabian Witt, American Contagions: Epidemics and the Law from Smallpox to COVID-19 24-26 (2020) (discussing the Metropolitan Board of Health). Regulation of those the City employs or with whom it contracts to work within its limits through the imposition of a vaccine requirement would certainly seem to fall within that broad mandate. Cf. Viemeister v. White, 179 N.Y. 235, 240 (1904) (noting that vaccination against smallpox is a requirement to serve "in nearly all the armies and navies of the world").

In any case, although the decision in Garcia only explicitly addressed mandated vaccinations for children, the Appellate

Division recently extended that prior holding to adult vaccinations in C.F. v. New York City Department of Health & Mental Hygiene, 191 A.D.3d 52, 64-65 (N.Y. App. Div. 2d Dep't 2020). In its decision issued on December 23, 2020, approximately nine months into the COVID-19 pandemic, the court upheld the Board's adoption of a mandatory vaccination requirement — applicable to all persons "older than six months of age who lived or worked within four specified zip codes" — arising out of a severe measles outbreak in Williamsburg, Brooklyn. Id. at 57, 69. The court's decision also upheld the Commissioner's authority to promulgate such a vaccination order pursuant to Section 3.01(d) of the New York City Health Code, which provides, in relevant part, that upon the declaration of a public health emergency, the Department's Commissioner may . . . issue necessary orders and take such actions as may be necessary for the health or the safety of the City and its residents," provided that any such orders "shall be effective only until the next meeting of the Board," where "the Board may continue or rescind" those orders.  See C.F., 191 A.D.3d at 57-58, 67.

    In its opinion in C.F., the Appellate Division made clear that it understood itself to be deciding "whether the Board of Health, as a means of controlling a contagion that has already spread, may mandate the vaccination of all persons who live or work, and children who attend school, within the affected area."

Id. at 62.  In so doing, the court explained that it was "very much aware of the COVID-19 pandemic[,] which has caused so much death, severe illness, and economic dislocation in our state and nation," as well as "the concerns expressed as to the willingness of the public to accept the vaccine voluntarily," potentially necessitating "the public health authorities to mandate the administration of a vaccine."  Id.  The court, in other words, presciently anticipated a case not unlike the present one challenging the authority of the Commissioner and the Board to require vaccination for COVID-19 and laid down a rule plainly deciding the issue in favor of sustaining such an order.  Thus, to the extent the Court of Appeals, in Garcia, left open any question as to the Commissioner's authority to issue a vaccine requirement applicable to adults to address a public health emergency, no ambiguity persists following the decision in C.F.  See V.S. v. Muhammad, 595 F.3d 426, 432 (2d Cir. 2010) (a federal court "is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion").

Nevertheless, Marciano seeks to distinguish the decision in C.F. from the present case, pointing to various differences between the Department's Order pertaining to COVID-19 and the measles-related order at issue in C.F., including that the Board's measles order provided an exception for people who could demonstrate they

"already had immunity to the disease," an exception the Order at issue here lacks.  191 A.D.3d at 58.  But, as the Court of Appeals explained in Garcia, it is not for the courts to "determin[e] whether a regulatory agency adopted the most desirable method or type of regulation."  31 N.Y.3d at 616.  Rather, once a court has concluded that "the agency has been empowered to regulate the matter in question, the separation of powers analysis goes no farther in reviewing the agency's methods."  Id. (citing Boreali v. Axelrod, 71 N.Y.2d 1 (1987)).

Accordingly, having concluded that the authority to require vaccination for City employees and contractors falls clearly within the Board's regulatory purview, The Court grants defendants' motion to dismiss count one of the complaint, which seeks a declaration that the Order is ultra vires under the New York State Constitution.

III. Preemption

Marciano's second cause of action assets that the Department's Order is invalid as preempted by state law. Specifically, he argues that the Order is preempted by New York's Public Health Law, which he characterizes as "explicitly limit[ing] the commissioner's authority to require vaccination to . . . 'children' and 'post-secondary students.'"  ECF No. 31 at 25.  In support of this position, Marciano points to Section 206(1)(l) of the law, which states, in relevant part, that

20

"[n]othing in this paragraph shall authorize mandatory immunizations of adults or children, except as provided in [Public Health Law §§ 2164 and 2165, mandating vaccination of children]." But, as the Court of Appeals explained in Garcia, these statutory provisions are directed to the powers and duties of the Commissioner of the New York State Department of Health and in no way limit the New York City Department or its Commissioner from issuing separate and independent vaccine requirements. See Garcia, 31 N.Y.3d at 620. Indeed, in C.F., the Appellate Division explicitly rejected the argument that the state Public Health Law preempted the City Commissioner's authority to issue a vaccine mandate applicable to adults. See C.F., 191 A.D.3d at 67.[10] Accordingly, the Order is not preempted by state law, and Marciano's second cause of action is dismissed.

IV. Substantive Due Process

Marciano's third cause of action alleges that the Department's Order violates his "right to bodily integrity," constituting a denial of substantive due process in violation of the Fourteenth Amendment. ECF No. 31 at 33. Such a substantive

---

[10] Marciano also suggests that New York State Department of Labor will likely adopt a rule mandating a mask and test requirement that will preempt the Department's Order. But this Court knows of no authority allowing a federal court to invalidate a duly issued order on such speculative grounds, and Marciano offers none.

due process claim, however, is foreclosed by the U.S. Supreme Court's decision in <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905).

At issue in that case was a regulation, promulgated in the midst of an epidemic by the board of health of the city of Cambridge, Massachusetts pursuant to a state statute, mandating that all inhabitants of the city of Cambridge be vaccinated against smallpox or face criminal penalty in the form of a fine.  <u>Id.</u> at 12.  The plaintiff argued that the statute violated his "inherent right" to "care for his own body and health in such a way as to him seems best."  <u>Id.</u> at 26.  But the Court rejected that argument, explaining that "[t]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community."  <u>Id.</u>  Accordingly, the Court upheld the vaccine requirement, concluding that a court must not invalidate a law or regulation "enacted to protect the public health" so long as it has "real or substantial relation [to public health]" and is not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  <u>Id.</u> at 31.

Although decided over a century ago, <u>Jacobson</u> remains good law.  As the Second Circuit recently stated in declining to enjoin a COVID-19 vaccination requirement similar to the one at issue here, "[b]oth [the Second Circuit] and the Supreme Court have consistently recognized that the Constitution embodies no

fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency, unconstitutional." We The Patriots USA, Inc. v. Hochul, 17 F.4th 266, 293 (2d Cir. 2021) (citing Jacobson, 197 U.S. at 25-31 and Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015)).  As such, a requirement that City employees and contractors receive a vaccine approved by the FDA, implemented in the throes of a pandemic to help stem the unremitting waves of illness within the City, does not facially violate any right to substantive due process.

In the face of this precedent, Marciano concedes that it is within the power of the state to enact a compulsory vaccination law like the one at issue here.  Nevertheless, he argues that while Jacobson upholds a state's authority to require vaccination, it does not similarly authorize Commissioner Chokshi, "a municipal health commissioner" who is not "accountable to the people," to exercise such power.  ECF No. 31 at 34.  But this assertion has no basis in the law.  Indeed, in Jacobson itself the vaccine mandate upheld by the U.S. Supreme Court had been issued by local health authorities – not the state legislature.  See 197 U.S. at 12-13.

More broadly, a state's delegation of its police power to an administrator is not subject to review as a matter of federal constitutional law.  See Sweezy v. State of N.H. by Wyman, 354 U.S. 234, 255 (1957) ("[T]his Court has held that the concept of

separation of powers embodied in the United States Constitution is not mandatory in state governments."). Accordingly, courts in this Circuit have uniformly recognized the validity of vaccine requirements imposed by the City and the Board when challenged on substantive due process grounds. See Maniscalco v. New York City Dep't of Educ., 2021 WL 4344267, at *3 (E.D.N.Y. Sept. 23, 2021) (denying motion to preliminary enjoin COVID-19 vaccination requirement for New York City Department of Education employees for failure to show likelihood of success on the merits), aff'd, 2021 WL 4814767 (2d Cir. Oct. 15, 2021); Abadi v. City of New York, 2022 WL 347632, at *2 (S.D.N.Y. Feb. 4, 2022) (denying motion to preliminary enjoin requirement that all City employees and covered contractors either be vaccinated or take weekly test for COVID-19 for failure to show likelihood of success on the merits). For these reasons, the Court dismisses Marciano's third cause of action.

V.   Procedural Due Process

Marciano fourth cause of action asserts a procedural due process claim based on the threatened loss of pay and employment he faces for failure to meet the Order's vaccine requirement. "A procedural due process claim requires the plaintiff to establish (1) possession by the plaintiff of a protected liberty or property interest, and (2) deprivation of that interest without

constitutionally adequate process." <u>Tooly v. Schwaller</u>, 919 F.3d 165, 173 (2d Cir. 2019).

As a public employee subject to discharge only for cause, Marciano has a constitutionally protected interest in his continued employment. <u>See</u> <u>O'Connor v. Pierson</u>, 426 F.3d 187, 196 (2d Cir. 2005); <u>see also</u> <u>O'Neill v. City of Auburn</u>, 23 F.3d 685, 688 (2d Cir. 1994) ("[The New York Civil Service Law] gives covered employees a property interest in their employment, so that they may not be terminated without notice and hearing."); <u>Capul v. City of New York</u>, 2020 WL 2748274, at *2 (S.D.N.Y. May 27, 2020) (holding that the New York Civil Service Law covers NYPD employees), <u>aff'd</u>, 832 F. App'x 766 (2d Cir. 2021). Accordingly, the question of whether Marciano's constitutional rights have been violated depends on what process he has or will be provided in connection with his threatened relegation to LWOP and termination and whether that process is constitutionally adequate.

Marciano argues that his procedural due process rights were violated because the NYPD has failed to adhere to the disciplinary procedures set forth in section 14-115 of the New York City Administrative Code and the NYPD Patrol Guide in enforcing the vaccine requirement. As an initial matter, it does not appear that Marciano is entitled to these protections as a matter of state or city law. Marciano has failed to satisfy a condition of his employment, that is, that he be vaccinated against COVID-19, and

"the termination of a public employee based on the employee's
failure to satisfy a qualification of employment unrelated to job
performance, misconduct, or competency does not implicate the
[Administrative Code's or the Patrol Guide's] disciplinary
procedures." Garland v. New York City Fire Dep't, 2021 WL 5771687,
at *5 (E.D.N.Y. Dec. 6, 2021); see also Broecker v. New York City
Dep't of Educ., 2022 WL 426113, at *9 (E.D.N.Y. Feb. 11, 2022)
("Recent case law from this Circuit and in the State of New York
supports a finding that vaccination is a lawful condition of
employment.")

More importantly, Marciano's arguments are beside the point.
The question for the Court is not whether state procedural law was
correctly followed or applied, but rather whether the process
provided satisfies constitutional requirements.  And to determine
whether process is adequate, the Court looks to "[f]ederal
constitutional standards rather than state statutes." Robison v.
Via, 821 F.2d 913, 923 (2d Cir. 1987); see also Cleveland Bd. of
Educ. v. Loudermill, 470 U.S. 532, 541 (1985) ("[O]nce it is
determined that the Due Process Clause applies, the question
remains what process is due . . . . The answer to that question is
not to be found in the [state] statute."); Russell v. Coughlin,
910 F.2d 75, 78 n.1 (2d Cir. 1990) ("[T]he fact that the State may
have specified its own procedures that it may deem adequate for
determining the preconditions to adverse official action . . .

26

does not settle what protection the federal due process clause requires.").

In order to satisfy the constitutional minimum, the predeprivation proceedings "need not be elaborate." O'Connor, 426 F.3d at 198 (quoting Loudermill, 470 U.S. at 545). "[T]he Constitution mandates only that such a process include, at a minimum, notice and opportunity to respond." Id. As defendants argue, Marciano received multiple forms of notice regarding the Department's Order more than a month before the deadline to comply or to seek an accommodation, including through an Administrative Bulletin sent to members of the police force and through an order issued by Police Commissioner Shea. See ECF Nos. 20-3, 20-4. Further, as reflected in Commissioner Shea's order, Marciano was given the opportunity to be heard as to the application of the Order against him by seeking an accommodation through the appropriate channels. See ECF No. 20-4 at 2.

Marciano fails to articulate how this process falls below the constitutional floor; and, given the case law making clear that "informal procedures," as opposed to a "formal hearing," are sufficient prior to an employee's termination, see Ezekwo v. N.Y.C. Health & Hosps. Corp., 940 F.2d 775, 786 (2d Cir. 1991), it appears that he was afforded constitutionally adequate process. Accordingly, Marciano's fourth cause of action is dismissed.

**CONCLUSION**

For the foregoing reasons, defendants' Motion to Dismiss the complaint with prejudice is hereby granted.  The Clerk of the Court is instructed to close documents numbered 27 and 30 on the docket of this case.

SO ORDERED.

Dated:    New York, NY

March 8 , 2022          JED S. RAKOFF, U.S.D.J.