M2S1MARA

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ANTHONY MARCIANO, individually
and on behalf of all other
individuals similarly
situated,

                Plaintiff,

      v.                                  21 Civ. 10752 (JSR)

BILL de BLASIO, et al.,

                Defendants.               Oral Argument (Remote)
------------------------------x
                                          February 28, 2022
                                          3:35 p.m.
Before:

                    HON. JED S. RAKOFF,

                                          District Judge

                         APPEARANCES

PATRICIA FINN, ESQ.
     Attorney for Plaintiff

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
     Attorneys for Defendants
BY:  EUGENIA FOWLKES, ESQ.
     Assistant Corporation Counsel
```

1    THE COURT:  This is Judge Rakoff.  Would counsel
2 please identify themselves.
3    MS. FINN:  Good afternoon.  Patricia Finn, F-I-N-N,
4 for Anthony Marciano, plaintiff.  Good day, sir.
5    THE COURT:  And counsel for the defendants?
6    MS. FOWLKES:  Good afternoon, your Honor.  This is
7 Eugenia Fowlkes, assistant corporation counsel, and counsel for
8 defendants.
9    THE COURT:  Okay.  So we're here on both the
10 defendants' motion to dismiss and the plaintiff's renewed
11 request for a temporary restraining order.  Let me deal with
12 the latter first.
13    Ms. Finn, do I understand that your client has
14 appealed the denial of his request for an exemption for an
15 accommodation.  And so he still is on active duty, yes?
16    MS. FINN:  Yes, your Honor.
17    THE COURT:  So there's no reason to have a TRO at this
18 point.  Aren't we in the position that we were at once before?
19 You know, if and when he is actually in immediate danger of
20 losing his job, you could come before this Court and ask for a
21 TRO and I will give it expedited treatment at that time,
22 probably the very same day, but until that happens, there's no
23 reason for a TRO, is there?
24    MS. FINN:  Well, you know, your Honor, I think there
25 is and primarily Detective Marciano has a 3 percent chance of

1   getting his religious exemption approved.  And when we met last
2   time, you know, irreparable harm was a very important issue.
3   And at the time, your Honor, we discussed whether or not
4   Detective Marciano, you know, had a large trust fund and, you
5   know, would be able to withstand that financial or pecuniary
6   injury.  And, you know, I thought a lot about that, and I
7   explained to you that there is no way for him to recover any
8   type of damage, even in the end --
9              (The reporter interrupted for clarification)
10             MS. FINN:  If he were to be injured, whether
11  physically by the vaccine, or whether or not he was discharged
12  from his job.  Your Honor, I would read a Supreme Court
13  decision, *Elrod v. Burns*.  I cited it in my papers.  And the
14  Supreme Court upheld the Court of Appeals, a decision to grant
15  the preliminary injunction, where the plaintiff was threatened
16  with dismissal based on a lack of patronage for the political
17  party in power.  And I was very clear on what you explained,
18  and I understood that, but I do believe that he's got a very,
19  very slim chance here, and the constitutional violations are
20  the irreparable harm.  It's not necessarily a pecuniary loss
21  but rather it is the denial of his Fourteenth Amendment and
22  Ninth Amendment due process rights to the statutory protections
23  and --
24             THE COURT:  But he has so far taken the position that
25  he's not going to comply because he thinks he's exempt or he

thinks it's illegal or whatever, and so in the meantime, he's remained on active duty.  And we all know that things are changing rapidly and lots of restrictions are being eliminated or reduced.  It just seems to me that I shouldn't willy nilly start issuing temporary restraining orders until there's a real genuine imminence of harm because he's about to be taken off active duty.  And what I say to you, once again, is, if that were to happen, then of course it would be easy for you to reapply because you've already done your papers, so to speak, and ditto the defendants, and I would decide that matter on a highly expedited basis, probably within a matter of hours.  But I just don't see why it's a prudent use of this Court's resources to issue a temporary restraining order now, assuming arguendo that you qualify for one, when in fact nothing has happened.  I recognize that -- and we'll sort of get into this on the standing issue when we turn to the motion -- that threats of being fired and the like provide standing and maybe even a basis for a TRO, but I just don't see it.  It seems to me like it's a waste of everyone's time at this point.

So I'm going to deny the TRO but expressly without prejudice to your reapplying on an expedited basis if he is told, you're about to be taken off active duty.  So let's turn to --

MS. FINN:  Thank you.

THE COURT:  Let's turn to what I think is the more

1   interesting issue, frankly, which is the motion to dismiss.
2   And let me hear first from defense counsel, then from
3   plaintiff's counsel.
4          MS. FOWLKES:  Good afternoon.  This is Eugenia Fowlkes
5   for the defense.
6          I want to start off by saying that the standing issue,
7   as I recognize you just mentioned it, your Honor, the standing
8   issue is still -- defendants believe it's still the
9   predominating argument here because the decision has not been
10  finalized and so there is no injury in fact yet that plaintiff
11  can bring forth and can bring forth to this Court for it to be
12  redressed, and so --
13         THE COURT:  Well, there are cases out there that seem
14  to suggest that the imminent threat of action can provide
15  standing.
16         MS. FOWLKES:  Yes, your Honor.  Defendants recognize
17  that there is this imminent threat piece, but that imminent
18  threat consideration is not necessarily a factor here for the
19  same or similar reasons that the TRO -- that defendants argue
20  that the TRO should not be granted, because there has not been
21  anything that has occurred yet, and so there is yet no standing
22  on the part of the plaintiff to argue an injury that has yet to
23  occur.  And in terms of imminence, it's not yet clear what the
24  injury might be, and it's hard to tell -- as your Honor
25  mentioned previously, things are changing, and things are

changing in a matter of moments.  And so it's hard to tell whether this may be imminent, that plaintiff's denial will be finalized and it will be affirmed.  That's too attenuated at this moment to tell whether or not it is imminent and whether it can be considered under the imminence prong.

          THE COURT:  So do we have any idea what the time frame is here?

          MS. FOWLKES:  Your Honor, I was trying to get an answer so far, and what it looks like here is -- you've read the papers and opposing counsel has read the papers as well -- that now that the appeal is before the Citywide Panel.  The Citywide Panel is handling all of these appeals, and there seem to be as many as thousands of appeals in the process.  The first appeals in this batch, according to the Citywide Panel, is the BOE, and then we have the fire department, FDNY.  So the NYPD just recently, as of last week, sent over the latest batch of appeals, which means that they are essentially -- if they're being considered in order, they are at the end.  So it's really difficult to tell at this moment how long that appeal will be.

          But as you've mentioned, as you recognized earlier, your Honor, while it's being appealed, the plaintiff is not going to be moved.  Plaintiff is not -- his status is going to be unchanged.  And so even though it's not quite clear or even though we cannot articulate a very clear time line right now, it is before the Citywide Panel, and they're just having to

1    handle a lot of appeals at the moment.
2             THE COURT:  So it's not imminent, at least in any
3    ascertainable respect.
4             MS. FOWLKES:  Correct.
5             THE COURT:  Okay.  So there are other arguments I know
6    that moving counsel has raised, but let me go, on this
7    argument, to Ms. Finn.
8             MS. FINN:  Your Honor, I was told that the information
9    being shared in the department is that it can be quite some
10   time before they get to discussing whether or not the appeal is
11   valid.  So I think we would be looking at quite a long time.
12   And there seems to be some dilatory tactic, waiting to the last
13   minute to turn us down, things like that, so I think it's going
14   to be quite a stretch.  However, you know, my client had
15   standing in state court, and the city came to this court and
16   argued that there was jurisdiction for you to hear the case.
17   And you agreed, and here we are.  And now for them to allege no
18   standing because there's no injury, well, I, again, dispute
19   that.  I would direct your Honor's attention to the Supreme
20   Court's determination in *National Federation* case, a decision
21   rendered January 7th, and that case upheld the Fifth Circuit's
22   ruling in *BST*.  And I suggest in my papers that all you really
23   need to do in our case is swap out the words "President Biden"
24   for "Mayor Adams" and then swap out "OSHA mandates" for "the
25   vaccine orders."  And I would also point out that in *BST*, and

in the *National* case in the Supreme Court, the issue of whether or not those people had been fired was not relevant to this determination.  What the Supreme Court and the Fifth Circuit are looking at is whether or not there is an alleged constitutional violation, and I do believe that it was -- I think the language was even a minimal violation was sufficient. The substance of those cases I think is -- the conclusion that the Court had was you can't take a public health mandate and then convert it to a workplace mandate through regulations. They are -- regulations, particularly by the Court of Appeals in *Garcia* and under the statute, public health law.

Moreover, if the health department was going to attempt to impose a mandatory vaccine that is not provided for in the legislation, my client is entitled to a hearing under the Public Health Law 2120, and in that situation, the burden would shift to the city to prove that my client is infected or suspected of infection and that the vaccination is the least restrictive alternative as opposed to PCR or -- PCR testing or -- I suppose, or masking.

Your Honor, there were several early release inmate cases, and it was held in one of those cases that the fact that the inmate seeking early release had been exposed to COVID and recovered demonstrated that natural immunity has a prophylactic type of effect.

There is also evidence to suggest that an individual

1   that has natural immunity, like my client, could suffer an
2   adverse reaction.  I don't know if you read the paper today,
3   but CDC is reporting 21 children -- I realize that's out of
4   millions, but there's a connection being made to people that
5   have previous immunity and are vaccinated again experience
6   hyper-immediate reaction.  Now we're not here on the science;
7   we're here on the law.  And the law protects my client's
8   substantive and procedural due process rights to the statutory
9   protections afforded to him under Public Health Law 2120, and
10  under that, he can file an Article 78 proceeding and demand a
11  hearing, and he did that, and we were ready to go in state
12  court, and now the city is claiming you have jurisdiction but
13  he doesn't have standing because he wasn't injured.  Well, he
14  is injured, because he's entitled to a hearing, and in that
15  hearing, the burden shifts to the city.  It is off of my
16  client.  My client would have an opportunity to demonstrate
17  natural immunity, he would have an opportunity to demonstrate
18  PCR and masking, and he would be able to demonstrate that he's
19  not infected or suspected of infection, and that --
20           THE COURT:  I don't think it's an issue I need to
21  reach on the pending motion, but just out of curiosity, how do
22  you propose to prove that he has natural immunity?
23           MS. FINN:  Well, he has positive titers, and positive
24  titers are blood work showing that somebody is naturally
25  immune, and that is on the record.

1     And I would add that when it comes to childhood
2  vaccines, where we all have a lot more experience, there are
3  many vaccines required under state law whereby an individual is
4  able to avoid that vaccine when they provide a positive titer.
5  For example, the measles MMR vaccine, where an individual has
6  the positive titers to the MMR vaccine, they can get a medical
7  exemption.  So these issues would be appropriate, and I believe
8  we would have had an opportunity with Judge Nervo to present
9  this type of evidence.
10     THE COURT:  All right.  Let me go back to defense
11  counsel, and you can say anything you want to in response, but
12  also, if you wanted to briefly say anything on the merits, I'm
13  happy to hear that as well.
14     MS. FOWLKES:  Your Honor, as far as the -- in response
15  to standing, defendants have already made the distinctions in
16  their papers, but to the extent that opposing counsel is
17  proposing that the right way for the defendants to proceed is
18  through Public Health Law 2120, Public Health Law 2120 only
19  applies to the control of dangerous patients.  It's explicitly
20  titled as such.  And so that is inapplicable here.  We have the
21  New York City Charter, Section 553, which gives the
22  Commissioner and Board of Health the authority to promulgate
23  these types of issues in pursuit of protecting the public
24  health, and the New York City Administrative Code empowers the
25  Department of Health, specifically Section 17-109, which is

1  specifically about taking measures for vaccination.  And so the

2  citations to the public health law are inapplicable here

3  because they ultimately do not -- they don't apply to the

4  plaintiff.

5          Plaintiff is asserting a right to bodily autonomy, but

6  defendants are not forcing plaintiff to do anything.

7  Defendants are not holding plaintiff down.  And so the cases

8  that are cited to that reference detainee or confining

9  patients, they're not applicable here.  And so this case and

10 similar cases have been upheld as a condition of a job, as a

11 condition of employment.  And so that's not implicating a

12 fundamental right.  And it's implicating the right to pursue

13 your employment, but it's not absolute.  And defendants propose

14 that plaintiff had a choice here, and has a choice still.  So

15 defendants will emphasize that we are not holding anyone down

16 for a vaccination, but we are proposing a choice here, and as a

17 condition of employment for a municipality—here, for the New

18 York City Police Department—a condition of employment was

19 lawfully promulgated, and that condition of employment is not

20 far off and it does not implicate a substantial fundamental

21 right.

22         And so, your Honor, defendants maintain that as of

23 this moment, plaintiff's requests are premature.  There is

24 nothing for which he needs to be redressed at this moment.  But

25 even on the merits, his claims would fail in light of the fact

1   that cases similar to this, disputing the vaccine mandate, have
2   continued to be upheld as a condition of employment, and it's
3   no different here.
4              THE COURT:  All right.  Thank you very much.
5              And I'll hear finally from plaintiff's counsel.
6              MS. FINN:  Your Honor, first of all, the cases that
7   the city is referring to involve First Amendment claims,
8   collective bargaining, and EEOC violations.  Every one of those
9   cases presumes the lawfulness of the mandate.  We do not
10  presume any such lawfulness.  The executive law does not give
11  the mayor the authority to implicate -- to mandate a vaccine
12  under the charter.  The fact is that the court was crystal
13  clear in *Garcia* that the Board of Health authority is limited.
14             And I ask you this, your Honor.  This is something
15  that occurred to me.  If *Garcia* is interpreting the way the
16  city is suggesting, to give them the authority to impose an
17  adult mandate -- first of all, that's not what *Garcia* said.
18  *Garcia* said it was a child mandate that was provided for in
19  2164 and 2165.  And in that case, schools requiring a flu shot
20  was what was at issue, and they at the same time clarified this
21  is not an adult mandate.
22             And the courts in *Boreali*, which was the smoking ban
23  case; *Hispanic Coalition*, which was the soda cup case; or in
24  *Garcia*, ruled that the authority was to oversee repeated
25  vaccinations and not to impose a mandatory vaccine.

1        And finally, if indeed the board of health has the
2   authority to mandate a vaccine, then why is it that the mayor
3   and the police commissioner and the fire commissioner and all
4   the department heads are trying to mandate this as an employee
5   mandate, which has already been shut down by the Supreme Court.
6   And I think *BST* from the Fifth Circuit is completely applicable
7   here.  There was no allegation there that anybody had been
8   fired.  But if indeed the Board of Health of the City of New
9   York has the authority to mandate a vaccine in the same way
10  they did to a flu shot, then why didn't the Board of Health do
11  this?  There is absolutely no explanation from the City of New
12  York as to why they're deviating from the precedent in *Garcia*.
13  *Garcia* said you can do this for kids.  If they think that
14  applies to adult mandates, then what is the explanation for
15  trying to do this through an employee mandate?  It's arbitrary
16  and capricious.  That alone demonstrates arbitrary and
17  capricious, because the Supreme Court, in a case called *In re*
18  *Charles* -- I'm sorry -- Court of Appeals, in a case called *In*
19  *re Charles*, specifically held that when a board or a body
20  deviates from preexisting precedent and they fail to provide an
21  explanation, that would be arbitrary and capricious.  If the
22  city has authority to do this, then why is there a mandate?  It
23  is arbitrary and capricious.
24        I believe you read all my papers, though.  I'll end on
25  that point.  But that is something that occurred to me.

1        THE COURT:  Okay.  So I'm sure that there are further
2   things that both sides might want to say, but I have your
3   excellent briefs and I also have other matters still later this
4   afternoon that I have to turn to.  So this has been very
5   helpful.  I will take the matter under advisement.  You have my
6   ruling for the TRO, but on the motion, I will get you a
7   decision certainly, in the next week or two.  And I thank both
8   counsel again for their excellent help.  Thanks very much.
9   Bye-bye.
10        MS. FOWLKES:  Thank you.
11        MS. FINN:  Thank you.
12                              o0o